**Carlos W. STOVER, Plaintiff,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Defendant.**

Civ. A. No. 2:86–1330.

United States District Court,
S.D. West Virginia,
Charleston Division.

April 6, 1987.

Jack W. DeBolt, Charleston, W.Va., for plaintiff.

Carl F. Stuky, Jr. and Steven P. McGowan, Steptoe & Johnson, Charleston, W.Va., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending before the Court is the motion of the Defendant, Aetna Casualty and Surety Company, for summary judgment. The time for responding having passed, the Court now deems the motion mature for decision.

### I. *Background*

A truck belonging to the Plaintiff, Carlos Stover, was destroyed by fire on September 7, 1986. Several tools on the truck were also destroyed. The Defendant had earlier issued insurance policies to the Plaintiff. One of the policies covered the truck and another covered the tools. The Plaintiff has sued to recover the proceeds of the policies. The Defendant moves for summary judgment claiming that the Plaintiff has breached provisions of the policies.

The policy covering the tools was issued to the Plaintiff on August 29, 1986. Among its provisions was the following: "The Insured ... shall submit ... to examinations under oath by any person named by the Company and subscribe the same; and, as often as may be reasonably required, shall produce for examination all writings, books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Company or its representative, and shall permit extracts and copies thereof to be made."

The "business auto policy" was also issued to the Plaintiff on August 29, 1986. Among its conditions was one requiring the Plaintiff to "[c]ooperate with [the Defendant] in the investigation, settlement or defense of any claim or suit." The policy further provided that "[n]o legal action may be brought against [the Defendant] until there has been full compliance with all the terms of this policy."

Exercising its rights under the policies, the Defendant took a sworn statement from the Plaintiff on October 7, 1986. The Defendant claims that the Plaintiff's failure to answer certain questions put him in breach of the cooperation clauses referenced above. Because of their importance to the instant motion, the Defendant's questions and the Plaintiff's answers are set out below in pertinent part:

"Q Have you had any other insurance, other than with Allstate and Foremost, before you had this policy with Aetna?

A Two other times, but like I say, I can't give you the names of them because I don't know right off. I can't tell you what they are.

Q Who was your agent?

\* \* \* \* \* \*

A I don't even know that. I can't tell you. Not until I go home and look, I don't know. I'm liable to tell you something that's not right.

Q  You have the paperwork at home on that?

A  I've got some paper, yes.

Q  You would be willing to give that to your attorney?

A  I sure will."

Plaintiff's examination transcript at 47–48.

\*　　\*　　\*　　\*　　\*　　\*

"Q  Okay. After you left Modern Restaurant, and up to the date of the fire, had you been employed by anybody else? Did you have any other sources of income?

A  Just what I've gotten out and done on my own, myself. And I don't want to get into that. That was not a company; that was just me, literally.

Q  What kind of income did you have?

A  Well, I done all right. I mean, you know, I don't want to get into that either because that's really—doesn't have anything to do with this here. That's me, literally, my own self. In other words, I wasn't even licensed or anything and I don't want to submit that.

\*　　\*　　\*　　\*　　\*　　\*

Q  Would you be able to provide the names of the people that you did work for and the approximate amounts?

A  Some of them, maybe. I don't even want to get into that, either.

Q  Why is that?

A  Well, actually, I made a lot of money under the table, and that's to my advantage. I made some money that way, and I don't want to get into that.

Q  I understand that, but I think part of our investigation is examining some of the financial stresses that were on you because of your testimony that you were unemployed.

A  I wasn't under no distress or anything. I mean, I lived quit [sic]

comfortable, my family; we don't want for anything. I mean, I'm no bum or not somebody out here starving to death. I get along."

Plaintiff' examination transcript at 59–60.

As a follow-up to the Plaintiff's sworn statement, Charles Waugh, a general adjuster for the Defendant, sent a letter,[1] dated October 14, 1986, to Plaintiff's counsel requesting the following information and documents:

"1. Receipts or other evidence of purchase of tools or other materials in truck at time of fire.

2. Names of insurance companies with whom you have had insurance or insurance losses in the last ten years, including the agents from whom you purchased insurance.

3. Business records showing customers and income for your personal business.

4. Bank records showing banks and account numbers where you have had accounts over the last eighteen (18) months."

Not having received a response, Waugh sent a second letter to the Plaintiff's counsel on November 6, 1986, requesting the same items. The Plaintiff's counsel replied by letter dated November 11, 1986. Because the content of his letter is one of the few operative facts, it too is set out at length in pertinent part:

"Please be advised that Mr. Stover does not have any receipts or other evidence for the purchase of tools or other materials in the truck at the time of the fire. With respect to the balance of your request this material does not appear to me to be material that Mr. Stover is obligated to provide to you under the terms of his policy inasmuch as none of it has to do with the occurrence or cause of the loss. In the event you feel that the policy does require the production of these materials I would appreciate your advising me as to specific language upon which you rely.

---

1. The letter, attached as an exhibit to the affidavit of Waugh, also mentions that the Defendant had earlier informed the Plaintiff that the Defendant's investigation had revealed that the fire was intentionally set.

It would appear to me that it would now be appropriate for Mr. Stover to institute litigation with respect to this loss. In the event that you are possessed of some information regarding the loss or the cause thereof which you feel might persuade me otherwise I would appreciate the opportunity to discuss it with you before this step is taken."

The Plaintiff initiated this action on or about November 18, 1986.

## II. *Discussion*

The Defendant contends that these policies contain, directly or by incorporation, the language of the 1943 New York Standard Fire Insurance Policy. The Standard Fire Insurance Policy is kept on file by the Insurance Commissioner of West Virginia and all fire insurance policies issued in the State of West Virginia must conform to its provisions. *W. Va. Code,* § 33–17–2. One particular provision of the policy requires the insured to submit upon request to an examination by the insurer, produce upon request books and records, and cooperate with the insurer in its investigation.

Despite the similarity in lanaguage of the floater policy's cooperation clause and the standard fire policy's cooperation clause, the Court notes that these policies do not, and are not required to, follow the language of the Standard Fire Insurance Policy. Admittedly, the loss in question was caused by fire, but these policies are not fire insurance policies. They are casualty insurance policies. *W. Va. Code,* §§ 33–1–10(e)(1) and (4). *W. Va. Code,* § 33–17–2, plainly states that the "Standard Fire Insurance Policy shall not be required for casualty insurance...."

Moving beyond that initial consideration, the Court notes that with regard to the floater policy (covering the tools) the distinction may not be that significant. The policy mimics in part the language of the Standard Fire Insurance Policy. Hence, though the floater policy is not required to follow the language of the Standard Fire Insurance Policy, its similarity on the significant clause allows analogies to be drawn to those cases which have addressed the Standard Fire Insurance Policy's cooperation clause. To a slightly lesser degree, this is also true for the more general cooperation clause of the business auto policy.

Cooperation clauses are commonly found in insurance policies. Their validity has become well established.

"The reason for including a cooperation clause in the policy and for conducting examinations pursuant to it is obvious enough. The company is entitled to obtain, promptly and while the information is still fresh, 'all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights to enable them to decide upon their obligations, and to protect them against false claims. And every interrogatory that [is] relevant and pertinent in such an examination [is] material, in the sense that a true answer to it [is] of the substance of the obligation of the assured.' "

*Dymo-Bite, Inc. v. The Travelers Cos.,* 439 N.Y.S.2d 558, 80 App.Div.2d 471 (1981) (*quoting Clafin v. Commonwealth Ins. Co.,* 110 U.S. 81, 3 S.Ct. 507, 28 L.Ed. 76 (1884)).

Courts have generally viewed compliance with insurance policy provisions as a condition precedent to recovery. *See e.g. Lentini Bros. Moving & Storage Co. v. New York Property Ins. Underwriting Ass'n.,* 76 A.D.2d 759, 428 N.Y.S.2d 684 (1980), *affirmed* 53 N.Y.2d 835, 440 N.Y.S.2d 174, 422 N.E.2d 819 (1981). Hence, the failure of an insured to cooperate with the insurer has been held to be a material breach of the contract and a defense to a suit on the policy. *Dymo-Bite, supra.* This is so whether the failure to cooperate is manifested by a refusal to submit to an examination under oath, *Kisting v. Westchester Fire Ins. Co.,* 290 F.Supp. 141 (W.D.Wis. 1968), *affirmed* 416 F.2d 967 (7th Cir.1969), or a refusal to produce documents. *Taubman v. Allied Fire Ins. Co. of Utica,* 160 F.2d 157 (4th Cir.1947). A case in point is *So. Guaranty Ins. Co. v. Dean,* 252 Miss.

69, 172 So.2d 553 (1965). Therein the plaintiff refused to give the insurer a copy of her income tax return or permit it to examine her checking accounts. The court held that her failure to cooperate voided the contract.

An outright refusal to submit to an examination is the easy case. Courts have also found a failure of cooperation, however, when the insured refused to answer material questions during the examination. *Robinson v. National Auto & Casualty Ins. Co.*, 132 Cal.App.2d 709, 282 P.2d 930 (1955). This is so because an insurer has a right to examine as to any matter material to its liability. *Gipps Brewing Corp. v. Central Manufacturers Mutual Ins. Co.*, 147 F.2d 6 (7th Cir.1945). Of course, the insurer is limited by a rule of reasonableness and specificity. It may not "roam at will through all of the insured's financial records." *Chavis v. State Farm Fire & Casualty Co.*, 317 N.E. 683, 346 S.E.2d 496 (1986).

■ This is not the easy case. The Plaintiff did cooperate to an extent. He made himself available for examination. He answered the great majority of the questions posed. Nevertheless, on one area of particular concern to the Defendant, his propensity to commit arson due to financial distress, there was a failure of cooperation. The Plaintiff either made no response, or gave vague, general answers when asked about his financial status. Through his attorney, he refused to turn over his income tax returns or bank statements from previous years. Once the Defendant put in issue the possibility of arson,[2] this information became pertinent.[3] The Plaintiff had the contractual duty—a duty supported by public policy—to cooperate with his insurer. An insured is presumed to know the terms, provisions and conditions of his policy. *Chavis v. State Farm Fire & Casualty Co.*, 79 N.C.App. 213, 338 S.E.2d 787, 789 *reversed on other grounds*, 317 N.C. 683, 346 S.E.2d 496 (1986).

The sphere of the Plaintiff's failure to cooperate here was greater in importance than it bore to the volume of material covered. That a stressed financial condition may provide the motive for arson is well recognized. It may be a key component of what is often a circumstantial case.

■ One manifestation of the Plaintiff's failure to cooperate with the Defendant was his filing of suit two months after the loss. Now, the Court realizes that two months can seem like a great amount of time to someone who has suffered a financial loss, especially a business loss. And the Court is not unmindful of the frustration which sometimes attends dealings with insurance companies. Nevertheless, public policy dictates that an insurance company be given a reasonable time to complete its investigation. In certain instances, a deliberate and thorough investigation can prevent needless litigation. Such an investigation also promotes society's interest in limiting coverage to those who have sustained legitimate losses.

Likewise, two months may seem an unreasonably lengthy period of time for investigation of a relatively small incident. The Court, however, in the context of this case, does not find it to be unreasonable. In the often slow-moving worlds of business and law, it cannot be said that the Defendant's pace was abnormally slow. It examined the Plaintiff exactly one month after the fire. Undoubtedly, its investigative machinery had been put in gear sometime before then. Following the examination by one week was a letter to the Plaintiff's counsel by Charles Waugh, a general adjuster for the Defendant. Waugh asked in part for documents which the Plaintiff, in his examination, had promised to provide. Having received no reply to his letter, Waugh sent a second letter to the Plaintiff's counsel on November 6, 1986. The letter reply of Plaintiff's counsel was

---

**2.** The Plaintiff had been informed of the Defendant's belief that the fire was intentionally set. See note 1.

**3.** "[T]he financial condition of the insured is a relevant matter of inquiry to an insurer suspecting arson." *Chavis, supra,* at 346 S.E.2d 498.

dated November 11, 1986. It did not reach the Defendant, however, until November 17, 1986. Although counsel for the Plaintiff appeared to indicate that his position on the requested documents was flexible, this action was initiated on November 18, 1986, the day after the Defendant received counsel's reply.

It must be kept in mind that the Defendant had not repudiated the policies at the time this action was initiated. At no time did the Defendant refuse or deny coverage. Its investigation was continuing. The Defendant kept the Plaintiff apprised of its ongoing investigation. Moreover, in his first letter to the Plaintiff and his counsel, Waugh emphasized that the Defendant had not denied coverage under either policy. In this vein, it has been held that an insured cannot "insulate itself against cooperation by commencing an action before there has in fact been repudiation of liability by the insurer...." *Lentini Bros. Moving & Storage Co. v. New York Property Ins. Underwriting Association*, 53 N.Y.2d 835, 440 N.Y.S.2d 174, 175, 422 N.E.2d 819, 820 (1981). Moreover, the business auto policy stated that no legal action could be brought until there had been full compliance with the terms of the policy.

## III. *Conclusion*

Based on the foregoing, the Court concludes that the Defendant had reasonable grounds for initiating and continuing an investigation.[4] The Court also concludes that the Plaintiff materially breached the insurance contract when he failed to fully cooperate with his insurer. Accordingly, the Court will enter summary judgment in favor of the Defendant.

---

4. The Defendant has isolated, without contradiction, no fewer than six facts which influenced its decision to pursue an investigation:

"(a) The plaintiff-insured had just started the business in which the truck and tools destroyed in the fire were to be used (Stover examination at 6–7) and the business had never advertised or developed; (Stover examination at 10);

(b) The plaintiff-insured had been self-employed or unemployed for two years prior to the fire and had limited resources (Stover examination at 8; 56);

(c) The circumstances surrounding the plaintiff-insured's loss were largely unconfirmable (Stover examination at 10–23);

(d) The plaintiff-insured had suffered several other insurance losses within the five (5) years prior to the loss at issue (Stover examination at 48–54);

(e) The plaintiff-insured refused to detail his sources of income for the year prior to the loss (Stover examination at 58–60);

(f) The plaintiff-insured paid $3,100.00 cash for the subject truck and over $5,000.00 cash for tools in a twelve-month period prior to the loss (Stover examination at 42, 67)."

Defendant's memorandum at 3–4.