283 N.J. Super. 601 (1995)
662 A.2d 1027
ROBERT DiFRANCISCO, PLAINTIFF-APPELLANT,
v.
CHUBB INSURANCE COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 16, 1995.
Decided August 16, 1995.
*603 Before Judges KING, D'ANNUNZIO and EICHEN.
Blake S. Davis argued the cause for appellant (Waters, McPherson, McNeill, P.C., attorneys; William J. Ward, of counsel; Mr. Davis, on the brief).
Robert H. Tell argued the cause for respondent (Tell, Chester & Breitbart, attorneys; Mr. Tell, on the brief).
The opinion of the court was delivered by EICHEN, J.S.C. (temporarily assigned)
Plaintiff Robert DiFrancisco commenced this action against his insurance company, defendant Chubb Insurance Company, seeking coverage under his homeowner's policy for loss of furnishings, clothing, and jewelry allegedly valued at $87,253. The complaint alleges these items were stolen from his single-family home in Livingston during two burglaries in March and May 1991. The judge granted defendant's motion for summary judgment dismissing the complaint because of plaintiff's refusal to produce the *604 income tax returns and books and records of two closely held corporations he controlled. The judge found that by refusing to cooperate, plaintiff had breached a material condition of the policy justifying denial of coverage. The judge did not reach the issue of plaintiff's alleged concealment or misrepresentation of facts as an alternative reason for defendant's denial of coverage although part of the basis for the motion. The judge also denied plaintiff's cross-motion for partial summary judgment seeking to require defendant to cover the losses.
On the motion, as here, plaintiff argued that he had made a good faith effort to comply with the conditions of the policy, claiming that he had furnished all existing relevant records except the corporate records. As to these, he claimed the law was unclear as to his obligations, and, in any event, in the absence of any objective evidence to support even a reasonable suspicion that he was involved in the alleged thefts, the corporate books and records and related financial information are immaterial to defendant's right to investigate the claim. Finally, he argued that an insurer should not be permitted to exercise unbridled discretion to demand these records on penalty of forfeiture of the insured's rights under the policy.
Defendant countered that reasonable suspicion exists to support its right to demand plaintiff's full compliance with its document requests. Defendant argued that the corporate books and records are highly relevant to plaintiff's financial ability to have acquired the items claimed stolen, to his motive for participating in the fraud, and to his gross exaggeration of the magnitude of the claimed loss. Defendant also contended that an order requiring plaintiff to produce the documents during litigation as part of discovery, three years after the burglaries, comes "too late" and would dilute its right to pursue a prompt investigation of the claim under the policy. Finally, defendant argued that, as a matter of law, plaintiff's "willful breach of the policy" by his failure to produce the requested records automatically voided the claim, *605 preventing him from seeking any legal redress in the courts as provided in the policy.
We affirm the grant of summary judgment in favor of defendant. Plaintiff's refusal to produce the corporate books and records constitutes a material breach of the policy given the substantial suspicious circumstances existing in this case. We add, however, that for future guidance, an insured who is uncertain as to whether it must comply with the document production demands of its insurer under its policy must promptly file a declaratory judgment action seeking judicial clarification of its obligations under the policy.

I.
We now review the background of the case based on the facts obtained during defendant's investigation of the claim through "examinations under oath" and from documents plaintiff produced. In May 1990, plaintiff obtained a homeowner's insurance policy from defendant for his residence located at 224 Hobart Gap Road, Livingston. The policy was effective from May 25, 1990 through May 25, 1991 and provided for "deluxe contents coverage" in the amount of $217,000 with a $250 deductible.
The relevant provisions "explain[ing] the conditions that apply to [the] policy" are as follows:
We do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss.
You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.
We have the right to examine under oath, as often as we may reasonably require, you, family members and other members of your household. We may also ask you to give us a signed description of the circumstances surrounding a loss and your interest in it, and to produce all records and documents we request and permit us to make copies.
You agree not to bring legal action against us unless you have first complied with all conditions of this policy....
*606 The record reflects plaintiff purchased the residence on November 30, 1988 shortly after his judgment of divorce on November 1, 1988. He contends that he retained interior decorators to decorate and furnish the home, claiming that he paid them $130,000, mostly in cash.
For sixteen years, plaintiff was the owner and operator of "Italian Touch," a pizzeria in the Livingston Mall. In September 1989, plaintiff started a new restaurant business in Phillipsburg, New Jersey known as "Rollie's Grill." In order to be near his new restaurant, plaintiff rented an apartment in Easton, Pennsylvania. After he opened Rollie's Grill, he left the Italian Touch to be managed by two employees. At the time of the alleged burglaries, plaintiff was commuting between Phillipsburg, Easton and Livingston trying to oversee both businesses.
Plaintiff alleged that he stayed in Easton between March 9 and March 23, 1991 and that sometime during his absence, the house in Livingston was burglarized and almost all of his possessions were stolen. Plaintiff reported the March burglary to the Livingston Police Department, who prepared an incident report dated March 23, 1991. A substantial number of household items are listed on the report which indicates the value of the stolen items to be $10,020.
Plaintiff contended that on May 15, 1991 his home was again burglarized. This time the police arrived while the burglary was in progress. They apprehended plaintiff's former wife who allegedly admitted removing bedroom furniture from the house claiming it was her furniture. Plaintiff did not file criminal charges against his former wife stating that he did not wish to pursue the matter because of his children.
During this same period, plaintiff was having serious financial problems. The record reflects plaintiff's businesses were failing. Between November 1990 and March 1991 the managers of Italian Touch had pilfered $100,000 from the pizzeria and were also under criminal investigation for an unrelated matter. Despite plaintiff's claimed investment of $80,000 in Rollie's Grill, plaintiff testified he *607 was never able to draw any income from the restaurant. The record reflects that as of March 1991 plaintiff had only $106 in the Howard Savings Bank. The record indicates that on March 22, 1991, the bank commenced an action to foreclose its mortgage on the Livingston house. Finally, as the result of failing to pay child support for over a year, plaintiff was threatened with incarceration when his former wife filed a motion in aid of litigant's rights in the Superior Court on March 19, 1991 claiming $15,075 in child support arrearages. On April 5, 1991, the court granted the relief and directed plaintiff to pay $5,000 toward the arrearages, plus other expenses by May 1, 1991 or risk incarceration. At his examination under oath, he denied he owed child support or that his house was in foreclosure at that time. Later, he produced documents that contradicted his testimony. Defendant contended the record of plaintiff's financial disarray and his misrepresentations at the examination under oath amply support its suspicions concerning the legitimacy of the claim.
In addition, defendant contended the circumstances of plaintiff's reporting of the alleged losses was suspicious. Defendant asserted it was not notified of the alleged loss from the March burglary until after May 6, 1991, the date reflected in a property loss notice prepared by plaintiff's insurance agent. That notice indicates that the entire claimed loss was in the sum of $25,000. Defendant also claimed it was not advised of the second burglary in May 1991 until almost one year later when on March 18, 1992 plaintiff's counsel sent a list of items plaintiff claimed had been taken during the burglaries. By this time, a year of inactivity had passed and defendant had closed its file. During this hiatus, the record reflects the total amount of the claimed loss had grown to $87,253. Plaintiff explained the discrepancy by denying he had told his insurance agent or the police that his losses totalled only $25,000 and $10,000, respectively.
Plaintiff's "examinations under oath" took place on August 5, September 22, and October 9, 1992. Here, too, defendant asserted plaintiff's testimony was not forthright. During the examinations, *608 plaintiff explained that he could not provide purchase receipts, canceled checks, or credit card documentation for the lost items because he had paid cash. However, plaintiff presented a list of some of the missing items and their values based on estimates his decorator, Frank Durante, had provided. Plaintiff testified that he had purchased the furnishings through Durante who could corroborate his claim. Contrary to plaintiff's testimony, however, Durante stated he had never seen any of the furnishings or improvements in plaintiff's house except the window treatments and a decorative shower curtain. He claimed plaintiff had told him to prepare the list and "make it look good." In essence, plaintiff contended he had furnished all available relevant information "[a]s a practical matter."
The record reflects repeated demands for compliance with the condition of the policy requiring production of plaintiff's books and records. On each occasion, defendant emphasized its "actions were without prejudice to or waiver of any of the conditions ... of the policy...." In a letter dated May 7, 1992 to plaintiff's attorney, defendant requested that plaintiff appear "to give testimony under oath as to all facts and circumstances surrounding the ... losses." Defendant demanded that plaintiff produce personal and corporate tax returns for 1990 and 1991, divorce and separation agreements and judgments, personal and corporate checking and savings account records, credit card records, and copies of mortgages, leases, bonds, and notes for three months before and three months after the burglaries. Defendant also requested bookkeeping ledgers and journals, bank statements and canceled checks, payroll records, and profit and loss statements for the Italian Touch restaurant for the period from January 1, 1990 to the date of the burglaries. Finally, defendant demanded appraisals, estimates, canceled checks, receipts or other documentation to prove the acquisition and value of the stolen items. The letter advised plaintiff that he would be under oath and that he "may wish to consult with an attorney."
*609 On May 13, 1992 plaintiff's attorney informed defendant that he would not provide the requested personal or corporate tax returns, personal or corporate checking account statements, credit card account information, mortgage, bonds and notes information, or any business records relating to the restaurants. The letter stated that these records were "not germane to the claim at issue."
On May 18, June 4, and June 18, 1992 defendant reiterated its demand for the records. Plaintiff's counsel requested the legal authority for defendant's document demands. In response, defendant provided plaintiff with the Law Division case, Ransom v. Selective Ins. Co., 229 N.J. Super. 43, 550 A.2d 1006 (Law Div. 1988). On July 8, 1992 after reviewing the Ransom case which involved an insurance claim by a plaintiff arrested for arson, plaintiff's counsel advised defendant that since plaintiff was not being investigated by the prosecutor's office in connection with the burglaries, Ransom was not applicable and he would not provide defendant with the requested records.
In a letter dated October 6, 1992, defendant again requested financial information for 1990 and 1991 for Rollie's Grill and the Italian Touch as well as checking and savings account information from Howard Savings Bank for the three months before and after the burglaries. Again, on October 19, 1992, plaintiff's attorneys rejected the demand for the corporate books and records, but did agree, under protest, to provide the Howard Savings Bank records. On October 21, 1992, defendant reiterated its demand for the corporate documents for the last time.
On March 1, 1993 defendant denied coverage because plaintiff had failed to produce the corporate documents demanded by defendant and had misrepresented and concealed material facts in submission of the claim.

II.
Although we have not previously considered the question of the effect of an insured's willful refusal to produce records alleged *610 to be material to an insurer's right to investigate a claim of alleged theft, in Ransom v. Selective Ins. Co., supra, 229 N.J. Super. 43, 550 A.2d 1006, Judge Haines considered a similar issue involving the scope of an "examination under oath" clause in connection with a fire loss claim. There, Judge Haines held that a fire insurer was entitled to obtain an insured's income tax returns and other financial information where arson was suspected in order to investigate and determine whether the insured's claim on a fire policy was legitimate. The clause in the fire insurance policy required an insured to submit to an examination under oath. The insurer requested to examine documents relating to the insured's financial condition at the examination. In considering whether the insured was required to provide such information, Judge Haines reviewed a number of decisions from foreign jurisdictions that had considered such clauses. Two cases he relied upon in Ransom held that "a claimant's financial condition is a relevant matter of inquiry when arson is suspected," requiring it to produce documents relative to that condition where "suspicious circumstances [are] present" and the request is "reasonable and specific." Id. at 46, 550 A.2d 1006 (citing Chavis v. State Farm Fire and Casualty Co., 317 N.C. 683, 346 S.E.2d 496, 498-99 (Sup.Ct. 1986), and Happy Hank Auction Co. v. American Eagle Fire Ins. Co., 286 A.D. 505, 145 N.Y.S.2d 206, 211 (N.Y. 1955), mod. on other grounds, 1 N.Y.2d 534, 154 N.Y.S.2d 870, 136 N.E.2d 842 (Ct.App. 1956) (holding that demand for documents was material where suspicious circumstances existed, and, therefore, demand for information had "point and direction")).
We agree and apply that rationale to this case. We perceive no difference between a case involving suspected arson and suspected fraud in connection with a theft claim. See Halcome v. Cincinnati Ins. Co., 254 Ga. 742, 334 S.E.2d 155, 157 (1985) (involving a theft claim and holding that where there is "evidence of possible fraud" information concerning the insured's financial circumstances is relevant and material to the claim under investigation, including "an investigation of the suspected fraud").
*611 The underlying purpose of an examination under oath clause requiring production of relevant documents is to allow the insurer to pursue its rights under the policy in order to determine whether the claim is legitimate and should be paid. See 2423 Mermaid Realty Corp. v. N.Y. Property Ins. Underwriting Association, 142 A.D.2d 124, 534 N.Y.S.2d 999, 1002 (N.Y. 1988), appeal denied, 74 N.Y.2d 607, 545 N.Y.S.2d 103, 543 N.E.2d 746 (N.Y. 1989).
As the United States Supreme Court observed more than 100 years ago in the seminal case of Claflin v. Commonwealth Ins. Co., 110 U.S. 81, 3 S.Ct. 507, 28 L.Ed. 76 (1884)
[An insurer is entitled] to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights, to enable them to decide upon their obligations, and to protect it against false claims.
[Id. at 94-95, 3 S.Ct. at 514-15, 28 L.Ed. at 82.]
In 2423 Mermaid Realty Corp., supra, the court recognized the importance of the insurer's ability to obtain all knowledge and facts concerning the cause of the loss while the information is still fresh. 534 N.Y.S.2d at 1003; see also Stover v. Aetna Cas. & Sur. Co., 658 F. Supp. 156, 159 (S.D.W. Va. 1987). To this end, New York courts have required "corporate officers and employees [to] appear, be examined and assist in the investigation as the policy requires them to do or [risk] ... be[ing] precluded from recovering under the policy." 2423 Mermaid Realty Corp., supra, 534 N.Y.S.2d at 1003 (quoting Dyno-Bite, Inc. v. Travelers Cos., 80 A.D.2d 471, 439 N.Y.S.2d 558 (N.Y. 1981)). These courts have recognized that delays in obtaining requested information frequently result in "a material dilution of the insurer's rights." Evans v. International Ins. Co., 168 A.D.2d 374, 562 N.Y.S.2d 692, 694 (N.Y. 1990) (relying on Williams v. American Home Assurance Co., 97 A.D.2d 707, 468 N.Y.S.2d 341 (N.Y. 1983), aff'd, 62 N.Y.2d 953, 479 N.Y.S.2d 216, 468 N.E.2d 54 (1984)).
Some jurisdictions view compliance with insurance policy provisions as a condition precedent to recovery. Diamonds & Denims, Inc. v. First of Georgia Ins. Co., 203 Ga. App. 681, 417 S.E.2d 440, *612 441 (1992); see also Stover v. Aetna Cas. & Sur. Co., supra, 658 F. Supp. at 157. In those jurisdictions, these clauses give unbridled discretion to the insurer to decide whether an insured has satisfactorily complied with its document demand. Thus, in many cases, an insured's failure to comply with its insurer's demand for production of allegedly relevant documents works a forfeiture of coverage, see Williams, supra, 468 N.Y.S.2d 341, even though an insured may claim to have a good faith belief that the documents are not material. Cf. Evans, supra, 562 N.Y.S.2d 692 (holding that an insured's reliance on advice of counsel that documents demanded are not relevant and need not be produced provides no protection against dismissal of its action for coverage).

III.
Analyzing these principles and applying them to this case, we conclude plaintiff's failure to produce the documents is a material breach of the conditions of his policy. Unquestionably, the information demanded is highly relevant to the insurer's inquiry concerning plaintiff's financial ability to have acquired the items and his potential motive for committing fraud by arranging the loss or exaggerating its magnitude. Moreover, defendant's demand for production of corporate documents is reasonable and specific in light of these concerns.
Notably, defendant had a reasonable basis for suspecting fraud in the submission of the theft claim. Plaintiff initially reported the amount of the loss to the police as $10,000. Three months later, when he notified defendant, the loss had grown to $25,000. During the following year, defendant's efforts to obtain documentation of the loss were unproductive. In 1992, counsel was retained. By then, the amount of the claimed loss had grown to $87,253 despite the fact that the second burglary could only have minimally enhanced the loss since most of plaintiff's possessions allegedly had been taken in the first burglary. The timely coincidence of plaintiff's dire financial circumstances with the occurrence of the losses is also suspicious as is plaintiff's inability to document the *613 cost of any of the purchases or produce proof of income in 1990-91.
We consider plaintiff's failure to produce the appropriate records as constituting a willful refusal to comply with the terms of his insurance contract. Moreover, we perceive the insurer's rights to have been materially diluted by the delay between the loss and resolution of the issue presented. See Williams, supra, 468 N.Y.S.2d at 343. Thus, no legal or equitable basis exists in these circumstances for giving the insured "another chance" to produce the records withheld. Ibid. Accordingly, we affirm the summary judgment dismissing the complaint.
Nonetheless, we are concerned generally about the potentially onerous consequence of an insured's refusal to comply with an insurer's request for production of information when the insured believes it has a reasonable basis for refusing to comply with the insurer's demands. Therefore, we believe a dispute over the scope of the insured's duties under an examination under oath clause may be settled more reasonably by a promptly filed declaratory judgment action under N.J.S.A. 2A:16-50 to -62, rather than waiting for resolution of the issue in an action to recover the value of the loss. N.J.S.A. 2A:16-53 states:
A person interested under a ... written contract or other writing constituting a contract, or whose rights, status or other legal relations are affected by a ... contract ... may have determined any question of construction or validity arising under the ... contract ... and obtain a declaration of rights, status or other legal relations thereunder.
[Ibid.]
In Hartford Accident and Indemnity Co. v. Selected Risks Indemnity Co., 65 N.J. Super. 328, 167 A.2d 821 (App.Div. 1961), this court noted the usefulness of a declaratory judgment action in resolving insurance disputes. There we stated:
The Declaratory Judgment Act ... is a remedial device designed to expedite the definitive establishment of private rights and duties and thereby forestall the emergence of costly and cumbersome trial proceedings. (citation omitted.)
* * * * * * * *

*614 As this court has previously remarked, "no more fertile ground exists for the use of the declaratory judgment procedure than in the field of insurance. .. ." (citations omitted) This is an area in which the construction of contractual language  a function for which the declaratory judgment machinery is tailor-made  is a constantly recurring event. To avoid overburdening the judiciary with purely hypothetical questions, however, the parties to the action must demonstrate possession of truly adverse legal interests of sufficient immediacy and reality.
[Id. at 331-32, 167 A.2d 821.]
Unquestionably, in these circumstances an insured and his insurer have "truly adverse legal interests of sufficient immediacy and reality." Ibid. The insurer has a right to obtain prompt investigatory information while it is "still fresh." Evans, supra, 562 N.Y.S.2d at 694 (citing Williams, supra, 468 N.Y.S.2d at 341). And, of course, the insured has a right to assert opposition and have a prompt resolution of the dispute without risk of irreversibly losing a chance to comply with his insurer's demands if the determination is not favorable to him. We believe the alternative remedy of a declaratory judgment action will resolve the insured's dilemma. As this court recognized in Utility Blade & Razor Co. v. Donovan, 33 N.J. Super. 566, 111 A.2d 300 (App.Div. 1955), a declaratory proceeding should relieve a party of its burden while at the same time allow the entire controversy to be settled. Id. at 573, 111 A.2d 300.
Thus, we hold that an insured in these circumstances must promptly file a declaratory judgment action seeking a determination of its obligation to produce the records demanded by its insurer under an insurance policy when the insured objects to their production. The insured may not wait to assert his rights until the eve of the expiration of the statute of limitations for filing suit to compel coverage. Such delay works too great a hardship to the insurer who must be able to promptly investigate the legitimacy of claims.
In the declaratory judgment action, plaintiffs may seek "a judgment declaring that [the] requests [are] improper" and that its failure to comply with them will not invalidate the policy. See 2423 Mermaid Realty Corp., supra, 534 N.Y.S.2d at 1002. In addition, the insured may seek a stay pendente lite from the *615 invalidation of the underlying policy, ibid., and a tolling of the statute of limitations until the declaratory judgment action is concluded. The insurer, of course, may counterclaim for a declaration that the insured is obligated to produce the requested documents and that failure to produce them will constitute a material breach of the insurance contract voiding coverage. Ibid. We anticipate that by proceeding in this manner resolution of future disputes will be more prompt and expeditious. The parties should consider using the summary procedure rule, R. 4:67-1(b), because in most cases these matters "may be completely disposed of in a summary manner." Ibid.
Affirmed.