Theresa B. MILES and James F. Miles, Plaintiffs,

v.

GREAT NORTHERN INSURANCE COMPANY, Defendant.

Civil Action No. 07–11722–NMG.

United States District Court, D. Massachusetts.

Nov. 30, 2009.

Roger J. Brunelle, Ralph F. Sbrogna, Fletcher, Tilton & Whipple, Worcester, MA, for Plaintiffs.

Mark W. Corner, Riemer & Braunstein LLP, Boston, MA, for Defendant.

## MEMORANDUM OF DECISION

GORTON, District Judge.

This case involves a dispute between an insurance company, Great Northern Insurance Company, and two of its insured, James and Theresa Miles, that arose after a fire substantially destroyed the Miles' residence in Rehoboth, Massachusetts. The Miles eventually filed a claim for the loss which Great Northern denied. The Miles then brought suit against Great Northern for breach of contract to which Great Northern responded with counterclaims for breach of contract and unjust enrichment.

This Court, sitting without a jury, presided over a three-day trial of this case in late September, 2009. The Court now announces its findings of fact and conclusions of law.

## I. *Findings of Fact*

### Parties

1. Plaintiffs James F. Miles and Theresa B. Miles (collectively, "the Miles"), husband and wife, are natural persons who reside in Rehoboth, Massachusetts.

2. Defendant Great Northern Insurance Company ("Great Northern") is a corporation licensed to sell fire insurance policies in the Commonwealth of Massachusetts. Great Northern, which has its principal place of business in Boston, Massachusetts, is a member of the Chubb Group of insurance companies.

3. Theresa and James Miles are the named insured under an insurance policy issued by Great Northern, Policy Number 11240825–01 ("the policy").

### The Fire and the Insurance Policy

4. In the early morning hours of October 17, 2004, a fire ("the fire") occurred at the insured premises located at 1 Running Stream Road, Rehoboth, MA ("the Premises").

5. Theresa Miles held title to the Premises which was a single-family home and the residence of Theresa and James Miles.

6. The Premises were secured by a fire and alarm service provided by Protection One Alarm Monitoring, Inc.

7. Theresa Miles owned most of the contents of the house destroyed in the fire, with the exception of a small amount of business property that belonged to James Miles.

8. At the time of the fire, there were two mortgages on the Premises. The first mortgage, held by Webster Bank, was in the amount of approximately $183,000 and the second mortgage, held by Simon Belli, Theresa Miles' father, as well as Jason Long and Joseph Mindick, was in the amount of approximately $611,000.

9. The policy insured the premises for the period from October 9, 2004 to October 9, 2005 with a Deluxe House Coverage limit of $1,080,000 and a Deluxe Contents coverage limit of $540,000.

10. The policy contains the following clause with respect to the duties of the insureds after a loss:

If you have a loss this policy may cover, you must perform these duties:

**Notification.** You must immediately notify us or your agent. In case of theft or accident, you must also notify the police or similar competent authority . . .

**Prepare an Inventory.** You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory . . .

**Examination under Oath.** We have the right to examine under oath, as often as we reasonably require, you, family members, and other members of your household. We also ask you to give a signed description of the circumstances surrounding a loss and your interest in it,

and to produce all records and documents we request and permit us to make copies.

**Proof of loss.** You must submit to us, within 60 days after we request, your signed sworn proof of loss which documents, to the best of your knowledge and belief:

-the time and cause of loss;

-interest of the insured and all others in the property involved and all liens, claims and obligations on the property; . . .

-specifications of any damaged building and detailed estimates for any repair of the damage;

-an inventory of damaged personal property;

-receipts for additional living expenses incurred and records supporting the fair rental value loss . . .

11. The Policy also includes the following "Subrogation Clause":

If we pay the mortgagee or loss payee for any loss and deny payment to you [the insured], then our rights are subrogated to all rights of the mortgagee or loss payee granted under the mortgage on the property.

12. Coverage under the Policy is rendered void for all insureds if "any covered person has intentionally concealed or misrepresented any material fact relating to this policy."

### The Investigation

13. The Miles reported the claim to Great Northern on October 18, 2004, the day after the fire occurred. Claims adjuster James Tagliente ("Tagliente") was assigned to the Miles' claim.

14. The initial investigation by local authorities indicated that the fire had been intentionally set. Accelerants were found

in the house and there was no sign of forced entry.

15. After learning of the local authorities' initial findings, Great Northern assigned Charles McIntyre ("McIntyre"), a member of its Special Investigative Unit, to investigate the claim.

16. The policy provides coverage for a fire loss, even an arson loss, so long as the insured did not intentionally cause or participate in the cause of the fire.

17. McIntyre's role, as special investigator, was to determine whether the Miles had any involvement in the cause of the fire and, accordingly, whether the loss should be paid or not.

18. Tagliente made several attempts to contact the Miles in the days and weeks following the fire but every attempt was unsuccessful. For over two weeks after the fire, Tagliente was able to contact the insured only through James Lehrberg, an attorney who was purported to represent the Miles at the time.

19. On October 22, 2004, McIntyre spoke with Jim Coyle, a representative of Protection One. Coyle told McIntyre that on the evening of the fire, the security alarm on the Premises had been armed and disarmed several times between 6:19 and 6:33 p.m. and that there was no subsequent recorded activity prior to the fire alarm activation at 12:28 a.m. (early the following morning).

20. McIntyre later determined that entry into the house was gained in a zone as to which the intrusion alarm had not been armed (Zone Four).

21. McIntyre also learned that one of the Miles' neighbors, Katherine Antonio, heard voices outside her bedroom window shortly after Midnight on the night of the fire, which led McIntyre to conclude that the person(s) who set the fire were not attempting to remain quiet as they entered the house.

**Recorded Interviews and Examinations Under Oath**

22. On November 4, 2004, McIntyre took a first recorded statement from James Miles. At that meeting, James provided answers to some of McIntyre's questions but refused to answer others or provided vague or unresponsive answers. Citing concerns about identity theft, he refused to offer even basic information, such as his annual income and social security number, and provided his cell phone number only after significant prodding.

23. Mr. Miles told McIntyre that a) he had been at the Premises on October 16, 2004 until approximately 5:30 or 6:30 p.m., b) he had trouble setting the alarm and may have bypassed Zone Four and c) he and Theresa had experienced problems activating Zone Four in the past.

24. Mr. Miles also stated that after leaving the house around 6:30 p.m., he drove to New Jersey to join his wife. En route to New Jersey, he inadvertently entered the New Jersey Turnpike through an "EZ Pass" lane and, because he did not have an EZ Pass, he paid at the toll booth and obtained a receipt. Although Mr. Miles told McIntyre that he was willing to show him the receipt, he could not produce it at the end of the interview. He also refused to identify his exact destination in New Jersey or his time of arrival, purportedly to protect his family's security.

25. At that same interview, James Miles told McIntyre that he had filed for bankruptcy, that he had a $1,000,000 judgment outstanding against him and that his wife was not gainfully employed.

26. On November 16, 2004, McIntyre began a recorded interview of Theresa Miles. Mr. Miles, purporting to act as her attorney, repeatedly interrupted the inter-

view and instructed her not to answer many of McIntyre's questions. As a result, McIntyre terminated the interview shortly after it began.

27. Great Northern engaged Attorney John Tener ("Tener") to conduct Examinations Under Oath ("EUOs") of James and Theresa Miles on December 22, 2004, and January 19, 2005, respectively.

28. In a letter dated December 10, 2004, Great Northern requested that Mr. Miles produce documents in connection with his EUO, including tax returns, bank statements, credit card statements, telephone records, documents related to bankruptcy, mortgage notes, and fire and burglar alarm records. The letter noted that failure to comply with the requests could result in forfeiture of the Miles' rights under the policy.

29. During his EUO, James Miles testified that he had been threatened several times in the year before the fire by people who said they would "destroy" him. He refused to reveal the names of the persons who threatened him, however, on grounds of attorney-client privilege. He testified that the Board of Bar Overseers had instructed him that he could not reveal that information unless Great Northern agreed not to disseminate it to others beyond what was absolutely necessary.

30. Mr. Miles also told Great Northern during the EUO that he had disclosed the names of the persons who had threatened him to the State Fire Marshall's Office in November, 2004, because they had agreed that the information would not be further disclosed unless it was absolutely necessary. James refused to provide Great Northern with the names, however, claiming that Tener would not give him adequate assurances of confidentiality.

31. The Miles, through Roger Lehrberg, submitted a proposed confidentiality agreement to Great Northern on October 21, 2004 which called upon Great Northern to resist court subpoenas and to assume complete liability for any losses resulting from the intentional or accidental dissemination of the Miles' personal information. Great Northern declined to execute the agreement because its terms far exceeded the terms of the policy. Neither the Miles nor Great Northern proposed an amended confidentiality agreement prior to October 12, 2005.

32. On December 8, 2004, McIntyre requested from the State Police a copy of its report on the investigation of the fire. On November 22, 2006, he requested the names of the suspects James Miles believed to be involved in the fire but he did not obtain the recording of the subject interview until January, 2007.

33. During Theresa Miles's EUO in January, 2005, Mr. Miles, again acting as her attorney, interrupted on numerous occasions and instructed her not to respond to questions or to turn over certain documents.

**The Miles' Failure to Produce Key Documents**

34. During the course of the investigation, McIntyre learned that a New Hampshire Superior Court judge had determined that testimony of James Miles during a proceeding in her courtroom was "completely lacking in credibility," thus suggesting a heightened need to verify information McIntyre received from Mr. Miles.

35. On February 11, 2005, Attorney Tener, on behalf of Great Northern, sent a letter to the Miles requesting various information that the Miles had failed to provide during their EUOs, including: a) EZ Pass records for October, 2004, b) receipts from New York and New Jersey toll charges, c) a credit card receipt from Ben-

nies, a store at which James Miles had made purchases on October 16, 2004, d) Protection One alarm records, e) written permission to obtain the alarm system memory chip, f) Federal and Massachusetts tax returns for 2002 and 2003, g) cellular phone records for October, 2004, h) documents related to credit card loans for October, 2004, i) checking account and savings records for the years 2003 and 2004 and j) the written contract with Paul Winnick, a public adjuster hired by the Miles.

36. The Miles provided Great Northern with copies of credit card receipts of Mr. Miles which included purchases made at Bennie's and Denny's on October 17, 2004, as well as a gasoline receipt from that same day, redacted telephone records and the contract with the public adjuster.

37. However, the Miles declined to provide their income tax returns in the absence of an executed confidentiality agreement. They also refused to authorize the release of their Protection One alarm records and failed to produce toll receipts which would have confirmed Mr. Miles' whereabouts on the night of the fire.

38. Great Northern repeated its requests for the withheld information in letters dated April 7, April 21, June 10 and August 30, 2005. In those letters, Attorney Tener explained the importance of the requested information and stressed that Great Northern had been unable to complete its investigation and adjustment of the claim because of the Miles' intransigence.

39. As of October 12, 2005, the Miles still had not provided the requested information.

### Adjustment of the Loss

40. The Miles engaged a public adjuster firm, Swerling Milton Winnick ("SMW") to present their claim to Great Northern.

41. On November 22, 2004, upon request from SMW, Great Northern advanced $25,000 to the Miles for Advanced Living Expenses ("ALE"). On that same day, Tagliente requested that the Miles and SMW submit their reconsideration cost estimate to Great Northern to permit adjustment of that component of the fire loss.

42. On December 10, 2004, Tagliente requested that the Miles submit a sworn proof of loss.

43. As of June 10, 2005, six months after Tagliente's request, the Miles still had not submitted a sworn statement of loss.

44. Between February and August, 2005, Great Northern sent the Miles six additional checks for advanced payments in accordance with its Advanced Payment Agreement, bringing the total of such payments to $250,000.

45. Under the terms of the Advanced Payment Agreement, if the claim was later deemed invalid, the Miles agreed to

> repay all advances made to them within thirty days of such determination by mutual agreement or by a court of competent jurisdiction.

46. On April 21, 2005, Tagliente repeated his request to the Miles for a sworn statement of loss.

47. On May 18, 2005, in response to Tagliente's second request, the Miles submitted a proof of loss form to Great Northern through retained counsel Alan Miller ("Attorney Miller").

48. The proof of loss stated the amount claimed as "to be determined" and the "cause and origin" of the fire loss as "unknown." The other required information on the form was left blank. The signed proof of loss was purportedly witnessed by

a notary public but was not dated or sealed by the Notary.

49. As of May 18, 2005, SMW had already obtained a building loss estimate for the Premises but the Miles' would not authorize SMW to use the estimate in support of their proof of loss and would authorize its use only with respect to Simon Belli's mortgage claim.

50. In a letter dated June 10, 2005, Great Northern rejected the Miles' proof of loss as untimely, incomplete and defective.

51. On August 16, 2005, the Miles, through Attorney Miller, submitted a contents loss claim to Great Northern in the amount of $750,000.

### Great Northern's Denial of the Claim

52. As of October 12, 2005, the Miles a) had not given Great Northern authorization to access their Protection One records, b) had not produced their tax returns and c) continued to refuse to identify the persons whom Mr. Miles claimed had threatened him and whom he believed may have caused the fire.

53. Due to the Miles' failure to answer questions and provide the requested documentation, Great Northern was unable to complete its investigation as to the cause of the fire and was unable to eliminate James Miles as the person who intentionally caused the fire or directed another person to cause the fire.

54. In a letter dated October 12, 2005, Great Northern denied the Miles' claim, citing the following grounds: a) refusal to answer questions or provide complete answers to questions under oath and in interviews, b) refusal to provide copies of requested documents and records, including tax returns, toll receipts and alarm records, c) failure to provide timely and proper proof of loss and d) failure to cooperate

in the investigation and adjustment of their claim.

55. Before denying the claim, Great Northern had already paid $189,103 and $611,198 to the first and second mortgagees, respectively, for a total of $800,301.

56. In September, 2006, more than 18 months after Great Northern's original request, the Miles, acting through new counsel, Attorney Ralph Sbrogna, authorized Great Northern to obtain their alarm records and indicated their willingness to turn over their tax returns if Great Northern executed a confidentiality agreement.

57. Great Northern finally obtained the Miles' alarm records from Protection One in November, 2006, and the Miles' tax returns on May 16, 2007, more than two years after Great Northern had originally requested them.

## II. *Conclusions of Law*

### A. Breach of Contract (Counts I and II)

### Duty to Cooperate

■ 1. When an insurer investigates a loss claim, the insured has a duty to cooperate by submitting to an examination under oath and producing documents relevant to the claimed loss. *Romano v. Arbella Mut. Ins. Co.*, 429 F.Supp.2d 202, 208 (D.Mass.2006); *see also* M.G.L. c. 175, § 99.

2. An insured is required to submit to examinations under oath and supply relevant documents to the insurer as conditions precedent to coverage under the Policy. *Mello v. Hingham Mut. Fire Ins. Co.*, 421 Mass. 333, 656 N.E.2d 1247, 1250 (1995); *Rymsha v. Trust Ins. Co.*, 51 Mass.App.Ct. 414, 746 N.E.2d 561, 563 (2001) ("We see no basis for a distinction between an obligation to submit to a reasonably requested examination under oath

and the duty to produce documents pertinent to the claimed loss").

■ 3. When an insured is suspected of arson, information concerning his financial situation, including tax returns, is material and relevant the insurer's investigation of the claim. *See Rymsha,* 746 N.E.2d at 563–64 (tax returns relevant to investigation of theft claim when circumstances gave rise to reasonable suspicion that claimant had motive to stage the loss); *Pisa v. Underwriters at Lloyd's, London,* 787 F.Supp. 283, 285 (D.R.I.1992) (financial information relevant to fire insurance investigation when insured was suspected of arson).

4. In situations where information material to a claim is "primarily or exclusively within the possession of the insured," the provision requiring submission to an examination under oath is particularly important for obtaining corroboration of a claim and weeding out fraud. *Lorenzo–Martinez v. Safety Ins. Co.,* 58 Mass.App.Ct. 359, 790 N.E.2d 692, 696 (2003).

■ 5. Failure to comply with the requirement for an examination under oath may constitute a material breach of the insurance contract and discharge an insurer's obligations thereunder. *Hanover Ins. Co. v. Cape Cod Custom Home Theater, Inc.,* 72 Mass.App.Ct. 331, 891 N.E.2d 703, 707 (2008).

■ 6. An insured's obligation to submit to an examination under oath is not met by incomplete testimony or promises to produce evidence in the indefinite future. *Dyno–Bite, Inc. v. Travelers Companies,* 80 A.D.2d 471, 439 N.Y.S.2d 558, 561 (1981); *see also Halcome v. Cincinnati Insurance Co.,* 254 Ga. 742, 334 S.E.2d 155, 157 (1985) (where insured submitted to an examination under oath but refused to answer questions or supply pertinent financial information).

■ 7. The failure of James Miles to respond to questions during his examination under oath and the failure of both plaintiffs to provide critical documents, including tax returns and alarm records, despite repeated requests of the insurer, constituted a material breach of the insurance policy.

**Attorney–Client Privilege**

■ 8. Although ordinarily a lawyer is under a professional obligation not to reveal information relating to his/her representation of a client, he/she may reveal such information to prevent the commission of a criminal or fraudulent act that he/she reasonably believes is likely to result in substantial injury to the financial interests or property of another. Mass. R. Prof. C. 1.6(b)(1).

9. In accordance with the Massachusetts Rules of Professional Conduct, James Miles was at liberty to disclose to Great Northern the identities of persons who allegedly threatened to "destroy" him.

10. The information Mr. Miles withheld from Great Northern during his examination under oath pertaining to alleged threats was not protected by the attorney-client privilege.

**Prejudice**

■ 11. Ordinarily, an insured's failure to cooperate is grounds for denial of coverage only if the insurer makes an "affirmative showing of actual prejudice" resulting from the failure. *See Romano,* 429 F.Supp.2d at 208. However, there is a limited exception to the prejudice requirement in cases of an insured's wilful and unexcused failure to submit to an examination under oath. *Lorenzo–Martinez v. Safety Ins. Co.,* 58 Mass.App.Ct. 359, 790 N.E.2d 692, 696 (2003).

■ 12. Because the information Mr. Miles withheld from Great Northern was not privileged, his failure to answer questions and provide documents material to Great Northern's investigation was wilful and unexcused and, as such, constitutes grounds for barring recovery under the Policy, even without a showing of prejudice. *See, e.g., DiFrancisco v. Chubb Ins. Co.,* 283 N.J.Super. 601, 662 A.2d 1027, 1033 (N.J.1995) ("We consider [the insured's] failure to produce the appropriate records as constituting a wilful refusal to comply with the terms of the insurance contract"); *Averbuch v. Home Ins. Co.,* 114 A.D.2d 827, 494 N.Y.S.2d 738 (1985) (insured's wilful refusal to answer material and relevant questions at examination under oath or to supply material and relevant documentation precluded recovery, even in absence of showing of prejudice).

■ 13. In any event, even though Great Northern is relieved of its burden of demonstrating actual prejudice, the Court concludes, for the reasons set forth below, that actual prejudice has been shown.

14. Great Northern was entitled to corroborate the limited information the Miles provided concerning the alarm system, their financial situation and alleged external threats. *See Hanover Insurance Co.,* 891 N.E.2d at 706–07; *Lorenzo–Martinez,* 790 N.E.2d at 696 (both discussing insurer's right to obtain formal corroboration of a disputed claim).

15. Mr. Miles' intentional obstructionism thwarted Great Northern's legitimate efforts to investigate the claim thoroughly and expediously, and, as a result of his breach of his duty to cooperate, Great Northern was unable to complete in a timely fashion its investigation and eliminate the plaintiffs as possible suspects.

16. Therefore, James Miles prejudiced Great Northern by withholding information "essential to [Great Northern's] sound coverage and defense decisions." *Metlife Auto & Home v. Cunningham,* 59 Mass. App.Ct. 583, 797 N.E.2d 18, 24 (2003) (holding that the failure to provide such information was "the quintessence of prejudice"); *see also Rymsha,* 746 N.E.2d at 564 ("[the insured's] refusal to furnish the reasonably requested pertinent information put [the insurer] in the untenable position of either paying the claim without question and without any means by which to investigate its validity").

**Imputed Conduct**

17. In accordance with the Court's September 14, 2009, Memorandum & Order, any breach on the part of Mr. Miles is imputed to Mrs. Miles. *See Miles v. Great Northern Ins. Co.,* 656 F.Supp.2d 218 (D.Mass.2009) ("the express language of [the policy] unambiguously bars coverage for an innocent co-insured spouse through the inclusion of the term 'any covered person' and, accordingly, it will be so construed.") *See also Yerardi v. Pac. Indem. Co.,* 436 F.Supp.2d 223, 249 (D.Mass.2006) (precluding coverage for an innocent insured, despite a severability clause, where loss was allegedly caused and concealed by her husband, another insured, and the policy excluded coverage for malfeasance "by [the insured] or a family member" as well as concealment by "any covered person").

**Right to Cure**

■ 18. An insured's right to cure a breach of the duty of cooperation is limited in scope, particularly in cases of willful failure to submit to an examination under oath. *See Rymsha,* 746 N.E.2d at 564–65 (refusing to recognize a right to cure a breach of the duty to cooperate after a previous determination that the insurer's request for information relevant to a claim of loss was reasonable); *Hanover Ins. Co.,* 891 N.E.2d at 708 (discussing courts' reluctance to allow insureds the opportunity

to cure a breach of their duty to submit to an examination under oath).

19. The Miles' willful refusal to comply with the terms of their insurance contract resulted in a material dilution of Great Northern's rights. *See Williams v. American Home Assur. Co.*, 97 A.D.2d 707, 468 N.Y.S.2d 341, 343 (1983). Accordingly, there is no legal or equitable basis on which to give the Miles a second (or third) chance to comply with their contractual obligations. *Id., see also DiFrancisco v. Chubb Ins. Co.*, 283 N.J.Super. 601, 662 A.2d 1027, 1033 (N.J.1995).

### B. Counterclaim: Advance Payments, Subrogation and Unjust Enrichment (Counts I, II and III)

20. Subrogation is an equitable remedy that exists to avoid unjust enrichment as a result of indemnification. *See Frost v. Porter Leasing Corp.*, 386 Mass. 425, 436 N.E.2d 387, 388–389 (1982).

21. An insurer's payments to a mortgagee as a result of a property loss do not have the effect of discharging the mortgage; the insured's debt is merely transferred to the insurer. *See East Boston Sav. Bank v. Ogan*, 428 Mass. 327, 701 N.E.2d 331, 334 (1998); 16 Couch on Ins.3d § 224:27 ("If the policy has been forfeited as to the mortgagor by reason of the violation of some provision not affecting the mortgagee, the mortgagor [insured] is not entitled to have the payment of a loss to the mortgagee credited on the mortgage debt; rather, the insurer is entitled to be subrogated to all the rights of the mortgagee as against the mortgagor, as stipulated").

22. Because Great Northern properly denied the plaintiffs' claim after paying their mortgagees, Great Northern became subrogated to the mortgagees' rights.

23. To deny Great Northern its contractual right to recover payments made to the plaintiffs' mortgagees would unjustly enrich the Miles by $800,301.

24. To deny Great Northern its contractual right to recover advance living expense payments made to the Miles would unjustly enrich them by $250,000.

25. Therefore, in accordance with the terms of the Subrogation Clause and Advanced Repayment Agreement of the Policy, Great Northern is entitled to recover $1,050,301 on its counterclaim.

### ORDER

Pursuant to the foregoing Memorandum of Decision, plaintiffs James and Theresa Miles are found to have breached their contractual duty to cooperate with Great Northern Insurance Company, thereby discharging Great Northern from its obligations to provide coverage under the Policy. Accordingly,

1) judgment will enter for defendant, Great Northern Insurance Company, on Counts I and II of plaintiffs' complaint and

2) judgment will enter for defendant, Great Northern Insurance Company, on Counts I, II and III of its counter-claim.

**So ordered.**