## CUSTODY OF TWO MINORS.

Norfolk. November 6, 1985. — January 27, 1986.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Constitutional Law,* Self-incrimination. *Practice, Civil,* Care and protection proceeding. *Parent and Child,* Care and protection of minor. *Minor,* Custody.

The privilege against self-incrimination applicable in criminal proceedings, which prevents the drawing of a negative inference from a defendant's failure to testify, did not prevent a judge in a child custody proceeding from drawing such an inference from the parent's failure to testify. [616-618]

In a care and protection proceeding under G. L. c. 119, §§ 23-27, a judge's decision awarding permanent custody of two children to the Department of Social Services was supported by clear and convincing evidence, including evidence in the record of past abuse or neglect suffered by the older child and of threats by the mother against the younger child, and testimony of social workers and other professionals that the children would be in danger of being subjected to emotional and physical harm if returned to their natural parents at that time, and, in addition, his findings were sufficiently detailed to support his conclusion that the parents were currently unfit to care and provide for their children. [618- · 621]

PETITION filed in the Quincy Division of the District Court Department on April 14, 1981.

The case was heard by *Lawrence D. Shubow,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Sara Berman* for the minors.

*William J. McGrath, Jr., & James A. Marsh,* for the parents, submitted a brief.

*Francis X. Bellotti,* Attorney General, & *H. Reed Witherby,* Assistant Attorney General, for Department of Social Services, submitted a brief.

HENNESSEY, C.J. The parents of two minor children appeal from the rulings and order of a judge in the juvenile session

of a District Court, in a care and protection proceeding under G. L. c. 119, §§ 23-27, committing the children to the permanent custody of the petitioner, the Department of Social Services (department). We transferred the case to this court on our own motion. The parents argue that the judgment should be reversed because the judge erred by drawing an inference against them from their failure to testify in the proceeding. Additionally, they contend that the department did not establish by clear and convincing evidence that the parents were unfit to have custody of the children, and that the judge's findings do not reflect careful consideration of the evidence. We conclude that the judge did not err in drawing a negative inference from the parents' failure to testify and that the department's evidence overwhelmingly demonstrated that the parents were unfit to provide care and protection for the children.[1]

We summarize the facts, using as our source the findings, order, and report of the trial judge.[2] The parents of the two

---

[1] The judge's report outlines numerous other rulings — largely evidentiary rulings — that the parents initially sought to have reviewed. As the parents do not argue those issues in their brief, we consider them waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

[2] The report is required by G. L. c. 119, § 27, and by Rule 3 of the Interim Supplemental Rules of Appellate Procedure in Care and Protection Cases (effective January 23, 1982). The rule requires a draft report to be filed by an appellant within thirty days of the date of filing of a claim of appeal. Although the judge issued the order on February 9, 1983, and the parents filed a timely notice of appeal, the parents did not file a draft report until November 2, 1984, and the report was not entered until February 6, 1985. Because we deal here with the custody of children, we exercise our discretion pursuant to G. L. c. 211, § 3, to reach the merits of the issues presented on appeal, see *Custody of a Minor (No. 2)*, 392 Mass. 719, 720 n.3 (1984); *Custody of Two Minors*, 19 Mass. App. Ct. 552, 553 n.2 (1985), but observe that the delay by the parents in prosecuting this appeal is inexcusable given the significant interest in the speedy resolution of custody matters. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 588 (1981) (interest of children best served by a stable, continuous family environment). See also *Lassiter* v. *Department of Social Servs.*, 452 U.S. 18, 32 (1981) ("child-custody litigation must be concluded as rapidly as is consistent with fairness"). The statutory requirement for a draft report should not be used as an instrument to delay and frustrate the progress of litigation.

minors were married on September 27, 1975. At the time of their marriage, both parents were in their mid-twenties. On January 1, 1976, the older of the two minors involved in this custody action, a son, was born. In March, 1976, the child was scalded while being bathed. When the son was less than five months old, on April 20, 1976, he was taken to the emergency ward of Quincy City Hospital. The father reported that the baby struck his head on the floor when a person holding the baby fell with the baby. An officer of the Quincy police department went to the home of the natural parents on June 21, 1976, in response to a report concerning an injured baby, and discovered the then five and one-half month old child lying in his crib with blood around his mouth. The father admitted having struck the baby to make him stop crying. The baby was treated at the emergency room of the Quincy City Hospital for a lacerated upper lip. Hospital records indicated that the mother had stated that the child was slapped hard by his father because the child was crying. On June 26, 1976, the parents voluntarily committed the child to the care of the department, and the child was placed with a paternal aunt. He was returned to his parents one and one-half months later. The parents and child began to receive support services from the department and its predecessor agency in 1976. These services included parenting instruction, foster care, weekly meetings with family members, referral for mental health services, day care for the child, and budget counseling for the parents.

No instances of abuse were documented during the next two years. In August, 1978, a social worker filed a notice pursuant to G. L. c. 119, § 51A, alleging that the child had sustained a bruised cheek inflicted by his father. A social worker at the child's preschool filed a report of abuse and neglect in January, 1981. The report alleged that the child had come to school with a "healed round burn on his right eyelid, over the cornea." In addition, the child reported that his parents had argued at home and that his father had thrown his mother across the room. The same social worker from the preschool filed a report of abuse and neglect in February, 1981. This report alleged that the child had come to school with third degree burns on

his hands and chest. The mother allegedly sent a note to the school explaining that the child had been playing near the stove and was burned by a pot of boiling macaroni.

A second child, a daughter, was born to the parents on February 13, 1981. On March 25, 1981, at 5 A.M., the Quincy police were called to the family home due to a domestic disturbance. When they arrived, the officers observed the father restraining the mother on the couch. According to the father, the mother had threatened to throw the five week old infant out the window.

During the first week of April, 1981, a social worker at the boy's preschool reported that the child informed her of threats by the mother to kill the new baby. On April 13, 1981, a department social worker responded to an emergency at the family home. He observed a bruise on the mother's right cheek. The mother informed the social worker that her husband had hit her with a closed fist. She also reported that she had a lump on the back of her head, received when her husband hit her head against the headboard of a bed. Both children were placed in the temporary custody of the department as a result of an emergency care and protection petition filed by the department social worker on the same day.

On May 8, 1981, the older child was returned to the care of his parents, and the younger child was scheduled to return home several weeks later. The older child was removed from his parents' home again on June 15, 1981, however, after his father became violent at a family outing and injured him, and the child has not been returned to his home since that time except for scheduled visits. The younger child has never been returned to the parents.

The original temporary order of custody provided for "liberal visitation." After unsupervised visits in November, 1981, the older child complained of being hit. The father admitted to hitting the child because of the boy's misbehavior. On December 24, 1981, and January 20, 1982, a social worker found the older child playing in the street by himself during unsupervised visits with his parents. The child's foster parents observed negative reactions after the child had visited his parents.

The department continued to offer and provide extensive services to the parents and children after entry of the temporary custody order, including: foster care for the children; weekly play therapy for the older child; programs at a mental health center for the mother and the younger child; and weekly individual and couples' therapy for the parents. In addition, referrals have been made to a family development clinic, and the mother has received weekly expressive therapy.[3] The judge found that, while the children were away from home and in foster care, the parents concentrated on their relationship and were able to make their home environment more stable. He also found that the parents attempted to cooperate with many of the programs made available to them, although the father rejected homemaker services. Both parents, he concluded, "evince appropriate reactions to loss of their custodial rights." From the record, the judge determined that, by early 1982, the parents had been making such progress and were benefitting so markedly from the various programs provided them that a consensus was developing among therapists involved toward return of the children to their parents.

The judge also found, however, that the mother consistently experienced grave difficulty in controlling the older child and essentially yielded him up to the excessive discipline of his father. An investigator appointed by the court determined that the mother was unable to handle both children, despite good intentions.[4] According to the therapist who saw the mother from April, 1981, until April, 1982, the mother had written a letter expressing concern about the prospect of the return of the children. The letter contained innuendoes of self-destruction and harm to the children.

Concerning the father, the judge adopted the opinions of a psychologist who evaluated the family in April, 1982, and

[3] The judge found that family service professionals who treated the mother noted that the mother's self-expression was inhibited. On occasion the mother had communicated her concerns to therapists by letter.

[4] In October, 1976, a psychiatric diagnosis of the mother had concluded that the family life-style was "chaotic" and described her as not having "developed adequate ego resources to cope with her feelings and conflicts."

these opinions were consistent with the conclusions of a 1979 diagnostic evaluation of the father. The judge found that the conclusions of various professionals involved with the family "raise[d] legitimate concerns about [the father's] capacity to be a competent parent" by reason of the history of abuse and aggressive behavior in the father's upbringing and the father's repeated loss of self-control and propensity toward anger. In addition, the judge found that the father failed to see the need for continued therapy and that the father did not understand the "seriousness of the family's proclivity for violence." The judge found that return of the children would undermine the gains realized by the parents through the programs offered by the department and their own efforts.

The judge found that the older child is aggressive and that this characteristic stems from fear. In addition, he found that the child did not view his environment as safe, could not control his impulses, and had a poor self-image. On several occasions, the judge found, the child had expressed either reluctance or unwillingness to visit his parents because of fear of his father. The judge adopted the opinion of the psychologist at Children's Hospital Medical Center, that the son needed an emotionally stable home environment unavailable to him in the home of his parents. The judge also ruled that, even though the younger child had not suffered any physical abuse or neglect at the hands of her parents, the court had the authority to take preventive action for her care and protection. See *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption,* 395 Mass. 180, 185 (1985); *Custody of a Minor (No. 1),* 377 Mass. 876, 883 (1979).

Based on these subsidiary findings relating to the best interests of the children and the ability of the parents to care and provide for the children, the judge found that returning the children to their parents would negatively affect the progress the parents had made in their own relationship and that no future time had been established indicating when, if ever, the parents would be able to care for their children. He concluded, therefore, that the parents were currently unfit to care for the children and ordered the children committed to the permanent custody of the department.

1. Neither parent testified at the hearing. In his findings, the judge stated: "From the failure of either parent to testify the Court infers that they are not able or willing to express themselves as capable of giving the love and care their children need." The parents argue that the judge erred in drawing a negative inference from the parents' failure to testify. They assert that this error was a violation of their right not to incriminate themselves under the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Declaration of Rights of the Constitution of the Commonwealth.

"In a civil action, a reasonable inference adverse to a party may be drawn from the refusal of that party to testify on the grounds of self-incrimination." *Wansong* v. *Wansong,* 395 Mass. 154, 157 (1985), quoting *Labor Relations Comm'n* v. *Fall River Educators' Ass'n,* 382 Mass. 465, 471 (1981). *International Fidelity Ins. Co.* v. *Wilson,* 387 Mass. 841, 849 n.10 (1983). No inference can be drawn, however, unless a case adverse to the interests of the party affected is presented so that failure of a party to testify would be a fair subject of comment. *Mitchell* v. *Silverstein,* 323 Mass. 239, 240 (1948). In other words, the adverse inference drawn from the failure of a party to testify is not sufficient, by itself, to meet an opponent's burden of proof. Applying these rules to the case before us, we conclude that the judge did not err in drawing a negative inference from the parents' failure to testify.

The unique characteristics of child custody proceedings do not require alteration or modification of the rule permitting inferences from a party's failure to testify in a civil case. Custody proceedings are not criminal in nature and, accordingly, the full panoply of constitutional rights afforded criminal defendants does not apply in these cases. *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 384 Mass. 707, 711 & n.10 (1981). As parens patriae, the State does not act to punish misbehaving parents but to protect children. *Custody of a Minor,* 389 Mass. 755, 766 (1983). *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 384 Mass. at 711. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 592 (1981). We

have rejected on previous occasions, therefore, opportunities to rule that certain constitutional rights attaching in a criminal proceeding apply in custody cases. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 384 Mass. at 710-711 (exclusionary rule); *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 592-593 (beyond a reasonable doubt standard of proof); *Custody of a Minor,* 375 Mass. 733, 746 (1978) (double jeopardy). Similarly, we do not accept the parents' argument here, but hold that the privilege against self-incrimination applicable in criminal proceedings, which prevents the drawing of a negative inference from a defendant's failure to testify, is not applicable in a child custody case.

In refusing to import all the attributes of criminal proceedings to proceedings involving child custody, we are not unmindful of the significant deprivation resulting when children are removed from their parents' custody. See *Lassiter* v. *Department of Social Servs.,* 452 U.S. 18, 27 (1981). Parents have a natural right to the custody of their children. *Custody of a Minor,* 389 Mass. at 765. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 587. This interest of parents in their relationship with their children is a fundamental right and is constitutionally protected. *Little v. Streater,* 452 U.S. 1, 13 (1981). *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 587. See *Lassiter, supra; Stanley* v. *Illinois,* 405 U.S. 645, 651 (1972). "[T]he right of parents to be free from intrusion by the State in matters of child-rearing [, however,] is not absolute." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 587. See *Custody of a Minor,* 389 Mass. at 765; *Custody of a Minor (No. 1),* 377 Mass. at 881. See also *Lassiter, supra.* In custody proceedings, the rights of the children to a stable and safe environment assume an importance at least equal to the interest of the parents in a fair proceeding. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 588. *Custody of a Minor (No. 2),* 378 Mass. 712, 721 (1979). Cf. *Wyman* v. *James,* 400 U.S. 309, 318 (1971) ("The dependent child's needs are paramount, and only with

hesitancy would we relegate those needs, in the scale of comparative values, to a position secondary to what the mother claims as her rights"). We think that the requirements that parents in child custody proceedings be represented by counsel and that the Commonwealth prove the parents unfit to care and provide for their children by clear and convincing evidence provide a sufficient measure of extra protection to which the parents are entitled, given the significant nature of the parental rights affected in custody proceedings. *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 384 Mass. at 711 n.10. See G. L. c. 119, § 29 (parents' right to counsel in custody proceedings). But see *Lassiter* v. *Department of Social Servs.,* 452 U.S. at 33 (Constitution does not require court to appoint lawyer for indigent parent in proceedings to terminate parental rights, although wise public policy may require that higher standard be adopted). See also *Custody of a Minor (No. 2),* 392 Mass. at 725 (clear and convincing standard of proof applicable in custody cases).

2. Similarly, we find no merit in the parents' contention that the judge's decision awarding permanent custody of their children to the department was not supported by clear and convincing evidence and that the judge's findings were not sufficiently detailed to satisfy the court's obligation in child custody proceedings. The standard of review in custody cases requires the findings of the trial judge to be left undisturbed unless clearly erroneous. *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption,* 385 Mass. 482, 489 (1982). *Petition of Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 371 Mass. 651, 656 (1976). *Custody of A Minor (No. 2),* 13 Mass. App. Ct. 290, 306, vacated on other grounds, *id.* at 1088 (1982). In applying the standard, the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference. *First Pa. Mortgage Trust* v. *Dorchester Savs. Bank,* 395 Mass. 614, 621 (1985). *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977). *Adoption of a Minor,* 17 Mass. App. Ct. 993, 995 (1984).

A decision to remove children permanently from the home of their natural parents must be supported by clear and convincing evidence that the parents are currently unfit to care and provide for their children. *Custody of a Minor (No. 2),* 392 Mass. at 724, 725. *Care & Protection of Three Minors,* 392 Mass. 704, 711-712 (1984). *Custody of a Minor,* 389 Mass. at 766. Cf. *Santosky* v. *Kramer,* 455 U.S. 745, 747-748 (1982) (clear and convincing evidence standard governs proceedings to terminate rights of natural parents). Additionally, the personal rights implicated in proceedings of this nature require the judge to exercise the utmost care in deciding custody matters. "Such care . . . demands that the judge enter specific and detailed findings demonstrating that close attention has been given the evidence and that the necessity of removing the child[ren] from [their] parents has been persuasively shown." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 592, quoting *Custody of a Minor (No. 1),* 377 Mass. 876, 886 (1979). *Care & Protection of Three Minors,* 392 Mass. at 712.

Here we conclude that the department met its burden of proof under the clear and convincing standard. In addition, we think the judge's findings were sufficiently detailed to support his conclusion that the parents were currently unfit to care and provide for their children. The judge made fifty-one findings of fact relating to the history of the parents' relationship with their children and the response of both the parents and the children to the various services the family had received through the department. See *Custody of a Minor (No. 1),* 377 Mass. at 885-886 (nature of custody proceedings requires that judge enter specific and detailed findings to demonstrate that evidence has been closely scrutinized and that persuasive case has been made for removing children from custody of their parents). These factual findings, and the conclusions the judge derived from them, were adequately supported in the record.

The evidence of incidents of past abuse or neglect suffered by the older child was undisputed.[5] In addition, the child's

---

[5] The parents object to the judge's characterization of the number and cause of physical injuries suffered by the older child. These objections are

foster father, psychologists, and social workers testified essentially that the child's parents could not offer the care and supervision he required.[6] Although no evidence existed that the younger child had suffered actual physical abuse or neglect at the hands of either parent, the record revealed that the mother had threatened the infant on more than one occasion. "[T]he State interest in protecting . . . children may properly be preventive as well as remedial." *Custody of a Minor (No. 1),* 377 Mass. at 882. Courts need not wait until they are confronted with a maltreated child before deciding that care and protection are necessary. *Id.* at 882-883. Social workers and other professionals providing therapy and other services to the family were virtually unanimous in stating that the parents were not presently fit to care for the children and that the children would be in danger of being subjected to emotional and physical harm if returned to the custody of their parents immediately. The judge could properly have concluded that committing the children to the custody of the department would be in their best interest.

While it is true that the parents have, for the most part, cooperated with services offered by the department, good intentions are not alone sufficient indicia of ability adequately to care for children. See *Care & Protection of Three Minors,* 392 Mass. at 712. Even when the efforts of these parents to develop and improve parental skills are considered, we find that the judge did not err in concluding that the department

---

without merit, as the judge's underlying factual findings are undisputed and a fair reading of the record supports his more generalized conclusions.

[6] The parents assert that the judge placed undue weight on the opinions of the various experts who testified during the proceedings. We do not agree with this contention for several reasons. First, the evidence presented in this case was largely the testimony of experts. The judge cannot be faulted for relying on what was essentially the only evidence before him. Second, the judge's order reflected a detailed and careful consideration of the entire record, evidenced by his substantial independent factual findings. Finally, as we noted, *supra,* the judge's assessment of the weight of the evidence and the credibility of witnesses is entitled to deference. To the extent that the judge adopted the opinions of experts as his own, we do not find any error.

had established by clear and convincing evidence that the parents were currently unfit to care and provide for their children and ordering the children committed to the custody of the department.[7] The court is permitted to assess prognostic evidence derived from prior patterns of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child. *Custody of a Minor (No. 1),* 377 Mass. at 883. We observe, however, that the judge's order does not terminate all the rights of the parents regarding these two children. These parents have available future opportunities to demonstrate their fitness and to regain custody of their children. G. L. c. 119, § 26 (1984 ed.).

*Judgment affirmed.*

---

[7] The parents' contention that the department failed to provide a proper program of assistance to the family — a program aimed at strengthening and encouraging family life — is without merit. As we have indicated, the record establishes that the family received extensive services, beginning with the initial encounter of the family with the department in 1976, and continuing through the time the custody hearings were held in 1982.