## ADOPTION OF NADIA & others.

No. 96-P-1063.

Hampden. November 8, 1996. - March 11, 1997.

Present: PORADA, GILLERMAN, & GREENBERG, JJ.

*Adoption,* Dispensing with parent's consent, Care and protection. *Parent and Child,* Care and protection of minor, Dispensing with parent's consent to adoption. *Minor,* Adoption. *Practice, Civil,* Burden of proof, Findings by judge, Objection. *Evidence,* Inference, Child custody proceeding.

In a proceeding under G. L. c. 210, § 3, to dispense with parental consent to adoption, the judge did not err in drawing a negative inference concerning the father's fitness from his failure to testify at the hearing, where there was other evidence of the father's unfitness. [306-308]

In a proceeding under G. L. c. 210, § 3, to dispense with parental consent to adoption, the judge's findings with respect to the father's inability to protect the children were supported by clear and convincing evidence and the judge's conclusion that the father was unfit was supported by the findings and was not clearly erroneous. [308-309]

PETITION filed in the Hampden Division of the Probate and Family Court Department on June 17, 1994.

The case was heard by *Marie E. Lyons,* J.

*Kathleen A. Townsend* for the father.

*Ann Balmelli O'Connor* for Department of Social Services.

*Dorothy Meyer Storrow* for the children.

GREENBERG, J. On June 17, 1994, six months after the birth of the parents' fifth child, the Department of Social Services (department) filed a petition, pursuant to G. L. c. 210, § 3, to dispense with the need for the parents' consent to the adoption of their children. Neither party disputes the incapacity of the children's mother at the time the petition was heard by a Probate Court judge on November 2, 1995. The question is the fitness of the father at that time. The oldest child, Nadia, was then six and one-half years old and her siblings

ranged in age from five years to a new-born infant, Karen, who was taken from her mother at the time of birth.[1] A judge of the Probate and Family Court found the father unfit and allowed the petition. This appeal followed.

The father argues on appeal that the judge (1) mistakenly drew an inference against him from his failure to testify in the G. L. c. 210 proceeding; (2) granted the petition despite lack of sufficient evidence; (3) made factual findings pertaining to fitness that are unsupported by the record; and (4) erroneously admitted certain evidence during the course of the hearing. We conclude that the judge acted properly in drawing a negative inference from the father's failure to testify and that the judge's findings do meet the requirements of *Santosky* v. *Kramer*, 455 U.S. 745 (1982).

The facts found by the judge, as supplemented by undisputed portions of the record, are these. The first child, Nadia, was born on April 20, 1989. There is no dispute among the parties that the family required and accepted voluntary services from the department at that time. By September, 1992, three more children, two sons and a daughter, had joined the family. In November of that year, the children became subjects of a care and protection proceeding under G. L. c. 119. The grounds for the petition were allegations that the father had engaged in sexual behavior with Nadia, and that all four children suffered from inappropriate nutrition, inadequate hygiene, and lacked a safe home environment.

The department removed two of the children from their parents' care after unsuccessful attempts to keep them at home. All four children were eventually placed in preadoptive foster homes as a result of orders pursuant to G. L. c. 119. The youngest child, Karen, was born on the day the department filed the c. 210 petition and has at all times been in foster care.

The judge found that from 1992 to 1993 the children were neglected in a variety of ways. For example, neither parent kept the children's medical appointments, administered prescribed medications, or generally attended to the children's dietary and hygienic needs. Three of the children, Nadia and her two younger brothers, Lawrence and Joseph, were malnourished. The judge also found that the father never

---

[1]As is our practice, we use fictitious names to preserve confidentiality.

demonstrated an ability to protect the children at that time. For instance, when the department's workers admonished the mother for allowing one of the children to crawl near electrical appliances without adequate supervision, the father did not intervene to solve the problem; he supposed that working to support them satisfied his parental obligations. The judge also found that the children were fed "junk food" during the time the father was at home.

Many of the judge's findings concerned efforts undertaken by the department to determine whether Nadia had been sexually abused. A physical examination disclosed signs of injury to her genitals. Although the judge found that Nadia was sexually abused, she made no final conclusion with respect to the identity of the perpetrator. It is clear from the judge's own observations of Nadia, as well as from other testimony and exhibits, that during the time her father resided in the household, she was "chronically sexually abused." On the testimony of the department's social workers, the judge also found that Nadia's behavior warranted removal from the household and placement in a foster home "because of her uncontrollable tantrums [and] sexual[] acting out."

On December 2, 1993, a District Court judge had suspended the father's visitation privileges with the children based on Nadia's allegations of his sexual abuse.[2] The father, therefore, has had no contact with Nadia or any of his other children since that time. While the judge did not conclude that the father sexually abused Nadia, she did find that he "never [sic] acknowledged that Nadia was sexually abused by anyone."

Since he physically left the household in 1992, the father had little involvement with any of his children. The department placed all of the children in preadoptive homes where their living conditions improved, and they continued to make substantial progress. The department continued to offer extensive services to both parents after the entry of the temporary custody order and the order suspending the father's visitation privileges. The father exhibited some signs of improvement. For example, the social workers enlisted the father's assistance to persuade the mother to comply with service plans and to grant permission for outside services.

1. *Father's failure to testify.* At the trial on November 2,

_____

[2]Nadia later recanted the accusation.

1995, the father was present and represented by counsel. The department did not call the father as a witness, and he chose not to testify on his own behalf. From his silence, the judge inferred that "he [did] not have a plan to care for his five children." In her findings, the judge also stated, "he is incapable of providing a safe environment . . . nutritious meals . . . or . . . proper hygiene nor does he [ ] bond with his children." The father argues that from his failure to testify, the judge impermissibly inferred that he was unfit. The question whether a negative inference concerning fitness may be drawn from a parent's failure to testify in a care and protection proceeding was decided in *Custody of Two Minors*, 396 Mass. 610, 616 (1986). That court held that, in a care and protection proceeding, no inference may be drawn from a parent's failure to testify until "a case adverse to the interests of the party affected is presented so that failure of a party to testify would be a fair subject of comment." *Ibid.*, citing *Mitchell* v. *Silverstein*, 323 Mass. 239, 240 (1948).

The father argues that a higher standard of review ought to apply when a judge draws an adverse inference in a parental rights termination proceeding under G. L. c. 210, § 3, as compared to a care and protection case. We disagree.[3]

The language in *Custody of Two Minors* is sufficiently broad to extend the same standard to a case involving termination of parental rights. First, the reasoning of *Two Minors* is not limited to care and protection proceedings. The court points out that, "In a civil action, a reasonable inference adverse to a party may be drawn from the refusal of that party to testify . . ." (citations omitted). *Custody of Two Minors*, 396 Mass. at 616 . Secondly, it is unnecessary to draw a distinction between the two proceedings where there is none with respect to the ultimate burden of proof, i.e., clear and convincing ev-

---

[3]We have found only one appellate decision in which the issue has arisen in a parental rights termination proceeding. In that case, *In re L.H. & L.H.*, 634 A.2d 1230 (D.C. 1993), the biological mother claimed that the trial judge erred in drawing "adverse inferences" from her refusal to take the witness stand. *Id.* at 1234. The court ruled, however, that while the judge may have drawn such an inference, it was not unfair; other evidence sufficient to support the judge's findings had been presented. *Ibid.* The negative inference was, at most, only one factor in that decision. Applying the standard, we think the judge's other findings concerning the father's unfitness, in the instant case, make the necessary link between the father's deficiencies and his failure to testify at the hearing.

idence. *Petition of the Dept. of Soc. Servs. to Dispense with Consent to Adoption*, 392 Mass. 696 (1984) (clear and convincing standard applied to adoption proceeding). *Custody of Two Minors*, 396 Mass. at 619 (clear and convincing standard applied to care and protection proceedings where department receives permanent custody). Compare *Care & Protection of Robert*, 408 Mass. 52, 68 (1990) (preponderance of the evidence standard applies to seventy-two hour hearings pursuant to G. L. c. 119, § 24). The fact that an adverse inference drawn from a party's failure to testify is not sufficient, by itself, in either type of proceeding for the department to satisfy its burden of proof, *Custody of Two Minors*, 396 Mass. at 616, provides extra protection to parents.

2. *Sufficiency of evidence of unfitness.* The manner in which the parental fitness test and the best interest of the child test are to be applied as "cognate and connected," *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975), has been discussed in many cases. Compendia of the authorities appear in *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. 793, 799-800 (1983); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 118-119 (1984); *Adoption of Katharine, ante* 25, 27-28 (1997). The record before her warranted the Probate Court judge to conclude that the father's deficits, matched with the needs of the children of tender years, would put the children's welfare at risk.

We think that counsel unfairly characterizes the judge's findings of unfitness as based on the judge's disapproval of "the parents' mode of family life." See *Custody of a Minor*, 389 Mass. 755, 767-768 (1983). As in *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. at 702, "[t]he judge's findings in this case were sufficiently directed to the question of the [father's] fitness, and free from the imposition of her personal beliefs, so as to be free from this kind of error."

The father also argues that the mother was the primary caretaker of the children and that after he left the household in 1992, fault could not be ascribed to him for her shortcomings. However, many of the events involving neglect happened before the father left the household. While it is true that since leaving, he has for the most part cooperated with

services offered by the department, his "good intentions are not alone sufficient indicia of ability adequately to care for children." *Custody of Two Minors*, 396 Mass. at 620. The judge made no specific findings on this point. Her ultimate conclusion, however, that the father paid little attention to the children's needs, was based on testimony of several social workers, Nadia, and a pediatrician. Their testimony established that on June, 1992, before the father left, Lawrence had recurring ear infections and required surgery. All of the children appeared unkempt and in need of baths. Inside the home, the children were not properly dressed, and Joseph, the youngest, was always in a diaper.

After reviewing the evidence and testimony properly before the judge, we conclude that the judge's finding that the father lacks the ability to protect the children was supported by clear and convincing evidence and was not clearly erroneous. *Adoption of Kimberly*, 414 Mass. 526, 529 (1993). The Probate Court judge had before her eighteen exhibits and the testimony of six witnesses. There were separate reports concerning four of the children, documenting neglect during the time the father was living in the household.

3. *Record support for findings.* The father claims that several of the judge's findings with respect to his knowledge of Nadia's abuse and his inability to protect the children are not supported by the evidence. Contrary to this argument, our review indicates that these findings are not clearly erroneous. See *Adoption of Kimberly, supra* at 529. Even if some infirmity existed, the remaining detailed findings support the judge's ultimate conclusion of parental unfitness. See *Custody of Eleanor*, 414 Mass. 795, 800-802 (1993).

4. *Admission of documents containing hearsay.* Finally, the father complains that the judge improperly admitted certain documents generated by the department's social workers and an investigator's report containing inadmissible hearsay information. No specific objection was presented at trial. "When a party objects to the admission of a document on the ground that portions of it contain inadmissible material, the objection must be specific; a general objection is not sufficient." *Adoption of Kenneth*, 31 Mass. App. Ct. 946, 947 (1991). We need not consider this issue.

*Decrees affirmed.*