MetLife Auto & Home *vs.* Diane Cunningham & others.[1]

No. 01-P-1541.

Bristol. March 20, 2003. - October 15, 2003.

Present: Doerfer, McHugh, & Mills, JJ.

*Insurance,* Homeowner's insurance, Insurer's obligation to defend, Cooperation by insured. *Contract,* Insurance. *Constitutional Law,* Self-incrimination.

In civil actions by the parents of a son who had been stabbed to death against the accused, an insured under a homeowner's policy issued by the insurer, and by the insurer, seeking a declaratory judgment, in which the insured repeatedly invoked his rights under the Fifth Amendment to the United States Constitution and refused to provide the victim's parents or the insurer with any information about the alleged stabbing, the judge did not err in awarding summary judgment to the insurer declaring that the insured's lack of cooperation relieved the insurer of its contractual obligation to defend and indemnify him, where a clause in the homeowner's policy requiring the insured to "cooperate with" the insurer in defending the parents' suit included the obligation to provide accurate information bearing on coverage, and where the insurer made an affirmative showing of actual prejudice resulting from the insured's refusal to disclose what had happened at the time of the stabbing, which necessarily kept from the insurer information that the insured alone was in a position to provide and that was essential to sound coverage and defense decisions. [587-592]

CIVIL ACTION commenced in the Superior Court Department on April 3, 2000.

The case was heard by *E. Susan Garsh,* J., on motions for summary judgment.

*J. Michael Conley* for Edwina Beland & another.

*Glenda H. Ganem (Michael L. Snyder* with her) for the plaintiff.

McHugh, J. Brian Cunningham was insured under a homeowner's policy issued by the plaintiff, MetLife Auto & Home

[1]Brian Cunningham, Edwina Beland, and Robert J. Beland, individually and as administrator of the estate of Jason J. Beland.

(MetLife).[2] Robert and Edwina Beland (the Belands) accused Cunningham of stabbing their son, Jason, to death and sued him on their own behalf and as representatives of Jason's estate. In the Belands' action and in a subsequent declaratory judgment action commenced by MetLife, Cunningham repeatedly invoked his rights under the Fifth Amendment to the United States Constitution and refused to provide the Belands or MetLife with any information about the alleged stabbing. As a consequence, MetLife moved for, and received, summary judgment declaring that Cunningham's lack of cooperation relieved MetLife of its contractual obligation to defend and indemnify him. Cunningham, his mother, Diane, and the Belands, all of whom were parties to the declaratory judgment action, have appealed. We affirm.

The facts, at least as revealed by the present record, are as follows. On December 28, 1996, the Belands' son, Jason, died of stab wounds.[3] Police investigation of the death quickly centered on Cunningham. He was arrested, charged with the stabbing, and released on bail. Subsequently, however, a two-day probable cause hearing in the District Court produced a finding of no probable cause; the charges were dismissed and no grand jury thereafter issued any indictment in connection with Jason's death.

After the probable cause hearing, the Belands commenced a civil action against Cunningham seeking recovery for Jason's wrongful death and conscious pain and suffering as well as for their own loss of consortium. The complaint alleged that Cunningham had "negligently, recklessly and/or intentionally and without justification" stabbed Jason and thereby caused his suffering and death. Cunningham's answer to the complaint is not part of the record but to each of the Belands' interrogatories

[2]The policy actually appears to have been issued by an entity called Metropolitan Property and Casualty Insurance Company. The declaratory judgment action from which this appeal is taken, however, names MetLife as the plaintiff. We follow suit.

[3]Jason's death by stabbing is the foundation on which all the litigation rests and the motion judge accepted that death as an undisputed fact. For purposes of this appeal, we therefore accept it as well, although we note that the record contains no death certificate, admission, interrogatory answer, affidavit, deposition, or other evidentiary document. See Mass.R.Civ.P. 56(c), (e), 365 Mass. 824 (1974).

that sought information about the circumstances surrounding the stabbing, Cunningham responded by saying,

> "Pursuant to the right afforded to me under the Fifth Amendment to the United States Constitution and Article Twelve of the Massachusetts Declaration of Rights, I respectfully refuse to answer this [question]."

Prior to Jason's death, MetLife had issued to Cunningham's mother, Diane, a homeowner's insurance policy that, among other things, provided her and members of her household with liability coverage up to a limit of $100,000. The policy obligated MetLife to defend against covered liability. Cunningham was a household member at the time of Jason's death and therefore was an "insured" under the policy.

At the Cunninghams' request, MetLife undertook defense of the Belands' action, albeit with a reservation of rights. MetLife also asked the Cunninghams to submit to an examination under oath. This they did, even though the policy did not require them to do so. Cunningham, however, invoked the Fifth Amendment whenever he was asked any question that touched on events surrounding Jason's death.

Shortly after completing the examinations under oath, MetLife filed the present action, naming the Cunninghams and the Belands as defendants, to obtain a declaratory judgment that it had no obligation to defend or indemnify Cunningham under the policy. The complaint alleged that Cunningham had intentionally stabbed Jason to death and that, because the policy contained an intentional acts exclusion, the policy afforded no coverage.[4]

---

[4]The policy's insuring clauses stated that MetLife would

> "pay all sums for *bodily injury* and *property damage* to others for which the law holds *you* responsible because of an *occurrence*. This includes prejudgment interest awarded against *you*."

The exclusion referenced in MetLife's declaratory judgment action said that MetLife did not cover

> "*Bodily injury* . . . which is reasonably expected or intended by *you* or which is the result of *your* intentional and criminal acts. This exclusion is applicable even if *you* lack the mental capacity, for whatever reason, to govern your conduct."

"Occurrence," like all of the emphasized words, was specifically defined in

When he answered the complaint, Cunningham asserted his privilege under the Fifth Amendment in response to each allegation about the stabbing.

At that point, correctly sensing that Cunningham did not intend to provide any information about Jason's death, both sides began structuring discovery in a manner designed to turn his silence to their advantage. The Belands filed a request under Mass.R.Civ.P. 36, 365 Mass. 795 (1974), that Cunningham admit he had "negligently or recklessly caused the death of Jason." Cunningham responded with the Fifth Amendment. MetLife countered with a rule 36 request in which it asked Cunningham to admit, among other things, that he had "acted with the intent to cause injury to Jason." It also took his deposition during which it asked him whether he had done so. In both settings, Cunningham unwaveringly asserted his Fifth Amendment privilege.

Armed with Cunningham's silence, portions of Diane Cunningham's examination under oath in which she said that she had never discussed with Cunningham any details of Jason's death, and an affidavit from the Belands' attorney stating that his investigation revealed "no potential eyewitnesses to the killing of Jason," MetLife moved for summary judgment on two grounds. First, it asserted that Cunningham's Fifth Amendment responses to the complaint and the discovery should be taken as admissions. Those admissions, in turn, showed that Cunningham had intentionally harmed Jason and, consequently, had no policy coverage. Second, MetLife alleged that, by asserting his Fifth Amendment privilege, Cunningham breached his contractual obligation to cooperate with MetLife,[5] thereby vitiating whatever obligation MetLife otherwise may have had to defend

the policy. The definition said this:

> "*OCCURRENCE*" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, resulting in bodily injury . . . during the term of the policy."

[5]The cooperation clause required Cunningham to "cooperate with [MetLife] and assist [MetLife] in any matter concerning a claim or suit" and, in addition, to "help [MetLife] in collecting and giving evidence and obtaining the attendance of witnesses."

or indemnify him. The Belands cross-moved for summary judgment on grounds that MetLife had failed to carry its burden of proving that coverage for Jason's injuries was excluded.[6]

In a thorough memorandum, the motion judge ruled that Cunningham had failed to cooperate with MetLife "by refusing to disclose any of the details of the stabbing incident either in response to queries from [MetLife] or in response to discovery in both [the declaratory judgment] action and the underlying action." She further ruled that MetLife was prejudiced by Cunningham's actions because his refusal to provide details "deprived [MetLife] of the ability to determine whether or not it may properly disclaim an obligation to defend and/or indemnify him based on the Policy's intentional and criminal acts exclusion." Finally, she ruled that Cunningham's refusal to answer prejudiced MetLife's ability to follow up on the possibility that he may have been acting in self-defense.[7]

Turning from facts to discussion, the MetLife policy, as noted, see note 5, *supra*, contained a clause requiring Cunningham to "cooperate with" MetLife in defending the Belands' suit. The duty to cooperate, found in virtually every liability policy, required Cunningham to "assist [MetLife] fully in its handling of the claim, its investigation and resolution of the claim, either by settlement or defense of the suit." 14 Couch on Insurance § 199:7 (3d ed. 1999). See 8 Appleman, Insurance Law and Practice § 4774, at 236 (rev. ed. 1981) (cooperation clause requires the insured to render "all reasonable assistance necessary to the defense of the suit").

Providing MetLife with information about how the incident occurred was at the very heart of Cunningham's duty to cooperate, particularly when that information was peculiarly within his

[6]Actually, the Belands moved first, but the court allowed MetLife's motion pursuant to Mass.R.Civ.P. 56(f), 365 Mass. 825 (1974), to continue the hearing until it had had a chance to complete additional discovery. The sequence of motions is of no consequence.

[7]The testimony on causation at the probable cause hearing was recounted during the course of MetLife's examination of Diane Cunningham under oath. The probable cause testimony suggested that Cunningham and three female companions had been accosted by three young men who yelled at them and followed them, and one of whom, brandishing a machete, told the women before they ran from the scene, "We're going to cut up your boy," "boy" being a reference to Cunningham.

knowledge. But Cunningham manifestly and persistently failed to provide that information when asked to do so in a number of different ways and at several different times. His assertion of rights under the Fifth Amendment to the United States Constitution and under art. 12 of the Declaration of Rights of the Massachusetts Constitution afforded him no sanctuary from his obligation to cooperate, for "it is not by the Commonwealth or by [MetLife] that [Cunningham] 'is compelled to . . . furnish evidence against himself,' but by his own contractual undertaking." *Mello* v. *Hingham Mut. Fire Ins. Co.*, 421 Mass. 333, 340 (1995) (assertion of Fifth Amendment rights does not excuse compliance with insurer's request for statutorily and contractually required statement under oath).[8] See *United States Fid. & Guar. Co.* v. *Wigginton*, 964 F.2d 487, 491 (5th Cir. 1992); *Powell* v. *United States Fid. & Guar. Co.*, 88 F.3d 271, 274 (4th Cir. 1996).

Vis-à-vis MetLife, the Belands are in no better position than Cunningham himself. See *Imperiali* v. *Pica*, 338 Mass. 494, 497-498 (1959); *Foshee* v. *Insurance Co. of N. Am.*, 359 Mass. 471, 472 (1971). See generally Restatement (Second) of Contracts § 309 comment c (1981); 2 Windt, Insurance Claims & Disputes § 9:11, at 78-80 (4th ed. 2001). They therefore advance several bases for concluding that Cunningham did not breach his agreement to cooperate.[9] All are unpersuasive.

The Belands first claim that the policy did not require an examination under oath and, consequently, that Cunningham's assertion of his Fifth Amendment rights during the course of the

---

[8]The statutory requirement at issue in *Mello* is found in G. L. c. 175, § 99, Twelfth, as part of the standard fire insurance policy there prescribed. The statutory requirement, however, did not limit the sweep of the court's holding regarding the role of the Fifth Amendment, for the court expressly recognized that the statutory provision was "but a . . . restatement and formalization (in so far as an oath is required) of the general obligation of insureds in many kinds of contracts of insurance to cooperate with the insurer in the investigation and verification of the claim." 421 Mass. at 340 n.6. Indeed, in this case the absence of any governmental mandate to cooperate, such as a statutory requirement, provides an even firmer basis for concluding that assertion of Fifth Amendment rights does not excuse Cunningham's failure to provide information the insurer requested.

[9]In this court, Cunningham filed no separate brief but did file a motion, which we allow, to adopt as his own all of the Belands' arguments.

examination was of no consequence. That is simply a non sequitur. Cunningham did not object to providing information *under oath*; he more broadly objected to providing any information in any form. The fact that he executed that objection during an examination under oath was a mere happenstance.

Next, the Belands assert that Cunningham had no duty to cooperate in the context of a declaratory judgment action because, in that context, he was the insurer's adversary. See *In-Towne Restaurant Corp.* v. *Aetna Cas. & Sur. Co.*, 9 Mass. App. Ct. 534, 539 n.5 (1980); *Eastern Airlines, Inc.* v. *United States Aviation Underwriters, Inc.*, 716 So. 2d 340 (Fla. Dist. Ct. App. 1998). Compare *American Paint Serv., Inc.* v. *Home Ins. Co.*, 246 F.2d 91, 93-94 (3d Cir. 1957) (fraud or false swearing). Even if there is no duty to cooperate in that context, Cunningham undeniably failed to provide the information when asked to do so before the action began, and his continuing refusal to do so as the action progressed simply showed that he had not changed his mind on that score.

Beyond that, the Belands' suggestion ultimately amounts to a broad assertion that the insured's duty of cooperation does not encompass an obligation to provide the insurer with information pertaining to the presence or absence of coverage. While there is some authority for that proposition, see *Martin* v. *Travelers Indem. Co.*, 450 F.2d 542, 553 (5th Cir. 1971) (applying Mississippi law), the Supreme Judicial Court has said that "[n]otice, consent-to-settlement, and cooperation provisions share a common purpose, [which is] to give an insurer the opportunity to protect its interests." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 123 (1991). See *Arton* v. *Liberty Mut. Ins. Co.*, 163 Conn. 127, 134 (1972). That being the case, the better rule is that the duty to cooperate does include the obligation to provide accurate information bearing on coverage.

> "Typically the insurer has little or no knowledge of the facts surrounding a claimed loss, while the insured has exclusive knowledge of such facts. The insurer is, therefore, dependent on its insured for fair and complete disclosure; hence, the duty to cooperate. While the insured has no obligation to assist the insurer in any effort to defeat recovery of a proper claim, the cooperation clause does

obligate the insured to disclose all of the facts within his knowledge and otherwise to aid the insurer in its determination of coverage under the policy . . . . The insurer is entitled, irrespective of whether its duty is to defend or to indemnify, to gain as much knowledge and information as may aid it in its investigation, or as may otherwise be significant to the insurer in determining its liability under the policy and in protecting against fraudulent claims. To hold otherwise effectively places the insurer at the mercy of the insured and severely handicaps it in contesting a claim" (citation omitted).

*Waste Management, Inc.* v. *International Surplus Lines Ins. Co.*, 144 Ill. 2d 178, 204 (1991). At least that is the better rule where, as here, there is no hint of an insurer's anticipatory breach of its own contractual obligations. Contrast *Remington Arms Co.* v. *Liberty Mut. Ins. Co.*, 142 F.R.D. 408, 417 (D. Del. 1992).

Finally, the fact that Cunningham may have provided some substantive information to the attorney MetLife appointed to defend him — a matter of pure speculation because the record on that score is silent — is inconsequential. The appointed attorney represented Cunningham, not MetLife, and indeed, may have been prohibited from disclosing to MetLife factual information adversely affecting Cunningham's coverage. See Stern, Dilemmas for Insurance Counsel — Coping with Conflicts of Interest, 65 Mass. L. Rev. 127 (1980). Cooperation with appointed counsel, although an element of Cunningham's duty to cooperate, does not exhaust that obligation.

Concluding that Cunningham failed to cooperate with MetLife does not end our inquiry. Failure to cooperate is grounds for denial of coverage only if the insurer makes "an affirmative showing of actual prejudice resulting from" the failure. *Darcy* v. *Hartford Ins. Co.*, 407 Mass. 481, 491 (1990). The interests of the insured and insurer are not the only interests likely to be affected by disavowal of coverage. Therefore, requiring an affirmative showing of prejudice "afford[s] to affected members of the public — frequently innocent third persons — the maximum protection possible consonant with fairness to the insurer." *Id.* at 490, quoting from *Oregon Auto. Ins. Co.* v. *Salzberg*, 85 Wash. 2d 372, 376-377 (1975).

Although a showing of prejudice is not, and should not be, easily made, see 1 Windt, Insurance Claims & Disputes § 3:2, at 179-182 (4th ed. 2001), we conclude that prejudice was shown here. This is a case in which coverage under the Met-Life policy involved determining whether Cunningham intentionally stabbed Jason and whether Cunningham intended to harm Jason or reasonably expected that at least some harm would attend any intentional act in which he engaged. See *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 84 (1984); *Newton* v. *Krasnigor*, 404 Mass. 682, 685-686 (1989); *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393, 399-400 (1990). Only in very rare situations, not including this one, will intent to injure (which, when construing insurance coverage, is not the legal equivalent of negligent or reckless infliction of injury) be inferred as a matter of law. See *Preferred Mut. Ins. Co.* v. *Gamache*, 42 Mass. App. Ct. 194, 200-202, *S.C.*, 426 Mass. 93 (1997).

Because coverage or lack thereof involved Cunningham's intentions, his statement about his own intent and expectations would have been of enormous value to MetLife even if the stabbing had occurred in the presence of others who were available to testify about what they saw. In the absence of any witnesses, Cunningham's statement on that subject was the sine qua non of any rational effort to assess MetLife's rights and obligations. Without such a statement, MetLife's interests were at the mercy of uncertain inferences — uncertain not only because their weight and impact on the fact finder is inherently difficult to predict but also because the inferences are relational, depending for their force and effect on the nature of the allegation in response to which Cunningham stood mute.[10] See *Quintal* v. *Commissioner of the Dept. of Employment & Training*, 418 Mass. 855, 861 (1994).

Reduced to essentials, then, Cunningham's refusal to disclose what happened on the night of Jason's death necessarily kept from MetLife information that Cunningham alone was in a position to provide and that was essential to sound coverage

[10]The relevant inference is an inference adverse to Cunningham's interests. In the Belands' tort suit, therefore, silence could produce an inference of reckless or negligent conduct. In MetLife's declaratory judgment action, the inference could be one of intentional conduct.

and defense decisions. That is the quintessence of prejudice. See *Rymsha* v. *Trust Ins. Co.*, 51 Mass. App. Ct. 414, 418 (2001).[11]

*Judgment affirmed.*

---

[11]This result relieves us of the obligation to decide questions involving the extent to which Cunningham's assertion of the Fifth Amendment in his answer to the Belands' or MetLife's complaint or in his responses to their rule 36 requests should be taken as admissions. See *National Acceptance Co.* v. *Bathalter*, 705 F.2d 924, 926-932 (7th Cir. 1983); *State* v. *Ott*, 167 Ariz. 420, 424-426 (Ct. App. 1990). See generally *Custody of Two Minors*, 396 Mass. 610, 616 (1986). Likewise, that result relieves us of the obligation to decide the thus far undecided question of the extent to which Cunningham and the Belands had the burden, even in a declaratory judgment action, see *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. 318, 321 (1991), of proving that the incident involving Jason was a covered "accident" under the policy, see *Highlands Ins. Co.* v. *Aerovox Inc.*, 424 Mass. 226, 230 (1997); *Noseworthy* v. *Allstate Life Ins. Co.*, 40 Mass. App. Ct. 924, 926 (1996); *Auto Club Group Ins. Co.* v. *Marzonie*, 447 Mich. 624, 650-667 (1994) (Levin, J., dissenting), and whether MetLife effectively relieved them of whatever burden they might otherwise have had by basing its claim of lack of coverage on a policy exclusion, see *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. at 86, instead of on an assertion that the alleged stabbing was not a covered risk.