A judge of the Juvenile Court ordered the entry of decrees terminating the parental rights of the mother and father as to Ariston and Max (children). The father appeals from the finding of his unfitness and the termination of his parental rights. The mother appeals from the determination that posttermination and postadoption visitation with the children "shall be left to the reasonable discretion of the legal custodians." We conclude that the judge's findings of fact are supported by the record and that those findings, when taken together, are sufficient to prove the father unfit. We discern no error of law or abuse of discretion in the judge's conclusion that it is in the best interests of the children to terminate the father's rights, or in her treatment of posttermination and postadoption visitation as to the mother.
In proceedings to dispense with parental consent to adoption, a judge is required to make specific and detailed findings. See Adoption of Quentin, 424 Mass. 882, 886 (1997). The judge's subsidiary findings will not be disturbed unless clearly erroneous. See Adoption of Gregory, 434 Mass. 117, 126 (2001). "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting from Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977). Taken together, the findings must prove parental unfitness clearly and convincingly. Custody of Eleanor, supra at 800. "In recognition of the trial judge's superior position to evaluate witness credibility and weigh the evidence, we review her findings with substantial deference." Adoption of Cadence, 81 Mass. App. Ct. 162, 166 (2012).
After a six-day trial, the judge made extensive findings leading to her ultimate conclusion that, pursuant to G. L. c. 119, § 26, the parents were unfit and that the children's best interests would be served by the termination of parental rights. That conclusion was neither erroneous nor an abuse of discretion. Because the mother has not appealed the termination of her parental rights, we consider the judge's findings only with reference to the question of the father's unfitness.
The judge found significant evidence of the father's twenty-year history of substance abuse, and poor decisions resulting from his addiction, that put the children at risk throughout their lives. The parents' relationship spanned a period beginning in approximately 2009, shortly before the mother's pregnancy with Ariston, through 2014. Both parents abused alcohol and drugs for many years, including while caring for the children, and both were arrested for various drug crimes.[3] The evidence at trial recounted numerous incidents of domestic violence between the father and mother, some of which ended in arrest.
In September, 2010, the Department of Children and Families (DCF) received a report alleging that the mother tested positive for marijuana and oxycodone the day prior to Ariston's birth. Ariston was observed for potential withdrawal, but was not removed from the mother's custody at that time. The children were first removed by DCF in March, 2013, upon the birth of the parents' second child, Max, because Max and the mother both tested positive for oxycodone and morphine, and the mother also tested positive for suboxone. DCF was granted custody of the children and, in April, 2013, the paternal grandmother was approved as a foster resource, conditioned upon the parents' restricted, supervised visitation. The father and mother ignored the restrictions and spent every day with the children. The paternal grandmother was awarded guardianship of the children in December of 2013 and obtained an apartment where she could care for them. Within a couple of weeks thereafter, the father and mother moved into the apartment with the paternal grandmother and the children.
Around May, 2014, the father convinced the paternal grandmother to move out of the apartment and to allow the mother and himself to reside there with the children. The father was aware of the mother's significant substance abuse problem,[4] but nonetheless often left the children in the mother's care all day while he was at work. The father was also using between sixty to seventy bags of heroin per day at that time, and by October, 2014, was using 100 bags per day. The father moved out of the apartment in September, 2014, because he did not want to share his drugs with the mother. The father continued to visit the children a few times per week, during which he occasionally used heroin with the mother. In October, 2014, police raided the apartment and the mother was arrested for possession of a class A substance (heroin) with intent to distribute. The children were home during the raid.[5] The children were removed for a second time and placed together in a foster home. The father, who was not present when police executed the raid, continued to use heroin until he surrendered himself in January of 2015 for charges stemming from the raid. Based on the evidence, the judge found a nexus between the father's drug use and lack of concern for the children's well-being in deciding to terminate his parental rights.
The father acknowledges his lifelong drug addiction and an extensive criminal history related to his addiction, but argues that the judge erred in not taking into consideration his present ability to care for his children. In January, 2015, while incarcerated, the father detoxed "cold turkey." The father began to engage in services and successfully completed an intensive, one-month addiction program.[6] On his own initiative, the father attended two Alcoholics Anonymous (AA) meetings per week and GED prep classes. When he entered a lower security facility, the father attended similar classes for two months.[7] While incarcerated, the father attended up to four AA meeting per week, though only required to attend one. Following his release from incarceration in October, 2015, the father continued to engage in substance abuse counseling and was screened for substances multiple times per week, the results of which were all negative. When the father was released from the treatment program, his counselor noted that the father engaged in treatment with a "positive attitude" and his participation was "excellent," concluding that the father should have a "successful re-entry into society." At the time of trial, the father had been sober for thirteen months and was able to maintain full-time employment. He was attending three AA meetings per week, a weekly relapse prevention meeting, and GED prep classes. The father was able to articulate a detailed relapse prevention plan that would maintain his sobriety.[8]
While the father is correct that a past drug habit or criminal record, without more, does not automatically translate to parental unfitness, see Adoption of Katharine, 42 Mass. App. Ct. 25, 34 (1997), the judge "is permitted to assess prognostic evidence derived from prior patterns of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child." Custody of Two Minors, 396 Mass. 610, 621 (1986). See Adoption of Katharine, supra at 33 (past behavior can be prognostic indicator of parent's future fitness); Care & Protection of Quinn, 54 Mass. App. Ct. 117, 126 (2002) ("While stale information cannot be the basis for a finding of present unfitness, prior history ... has prognostic value" [quotation omitted] ). "A judge ... does not have to wait for disaster to happen. In determining parental fitness a judge may use past conduct to predict future ability and performance." Custody of Michel, 28 Mass. App. Ct. 260, 269-270 (1990). A judge can "properly rely upon prior patterns of ongoing, repeated, serious parental neglect, abuse, and misconduct in determining current unfitness," including a prior pattern of substance abuse despite evidence of current progress made in overcoming an addiction. Adoption of Diane, 400 Mass. 196, 204 (1987). See Adoption of Elena, 446 Mass. 24, 33 (2006) (judge found mother's recent progress at rehabilitation questionable based on lengthy past involvement with drugs and effect on her ability to parent). A judge is "bound to consider any evidence of recent positive gains, along with evidence of a likelihood of genuine improvement in the [parent's] situation." Adoption of Serge, 52 Mass. App. Ct. 1, 7 (2001) (in upholding termination of parental rights, judge noted mother's lengthy period of addiction was unmarked by persistent, serious, significant, or voluntary periods of sobriety outside of court-mandated treatment).
When analyzing the father's recent sobriety, the judge weighed the likelihood of the father's continued sobriety against his consistent substance abuse for two decades and his failure to complete any treatment before his incarceration. Although the father has made laudable strides toward sobriety and self-improvement, the judge did not abuse her discretion in concluding that his long-standing past behaviors were reliable prognosticators of his current and future fitness. The father has no record of sobriety outside his incarceration and the regulated context of his postrelease probation.[9] The children should not have to face further risk while waiting to see if the sobriety the father achieved and sustained during the period immediately preceding trial are sustained once he is freed of the sanctions and close oversight provided by the conditions of his probation.
Additional evidence supports the judge's conclusion that it was in the children's best interests to terminate the father's parental rights.[10] Even before Max's birth, Ariston suffered adverse effects from the parents' drug addiction and unstable relationship. The father and mother separated numerous times and Ariston was frequently moved among different caretakers and different dwellings. Max has never lived in the father's legal custody and Ariston has not lived in the father's legal custody since March, 2013. The adoption social worker testified at trial that the preadoptive parents, with whom the children have lived since June, 2015, were attentive, caring, and affectionate advocates for the children and that the children were thriving in their care.[11] The judge's findings and conclusions in terminating the father's parental rights are supported by clear and convincing evidence.
The judge also did not abuse her discretion in ordering posttermination and postadoption visitation between the father and the children, but leaving visitation by the mother to the discretion of their legal custodians. The judge has equitable power to order posttermination and postadoption parental contact that is in the best interests of the children and to consider the "constitutional limits on intrusions on the prerogatives of the adoptive family." Adoption of Vito, 431 Mass. 550, 561-562 (2000). A judge may decline to allow any visitation after determining that a parent is unfit. Adoption of Helen, 429 Mass. 856, 863 (1999). As a baseline for a posttermination or postadoption visitation order, a judge must find an existing bond between parent and child. See Adoption of Vito, supra at 562-564. Further, if a child is residing with a preadoptive family at the time of trial, the judge may consider whether the child has a bond with the preadoptive family or whether easing transition to that family requires visitation with the biological parent. See Adoption of Ilona, 459 Mass. 53, 63-64 (2011).
In reaching her decision, the judge properly considered the best interests of the children, the rights of the preadoptive family, and the lack of evidence that visitation with the mother aided the children in their transition. Unlike the father, at the time of trial the mother presented little evidence of sobriety, dedication to sobriety, or service plan compliance. The judge found merely that a "relationship" existed between the mother and the children, but not a bond. There was evidence that visitation with the mother had negatively affected the children, and nothing was presented to show that the children required ongoing contact with the mother to ease their transition to the preadoptive family, where the judge found they were currently thriving. In the circumstances, the judge did not err in declaring that the adoptive parents were in the best position to gauge whether visitation with the mother would be in the children's best interests.[12]
Decrees affirmed.

The father's CORI results from November of 2015 showed thirty-four adult charges, including drug trafficking and possession.

The mother was using 100 bags of heroin per day at the time.

The children were dirty and did not appear to have been bathed that day. Max's diaper was so soiled that it was hanging from his body and had to be changed by a police officer. Drugs and paraphernalia were found throughout the house, including in the children's bedroom.

The program included individual counseling, group therapy, and twelve-step meetings covering addiction, alcohol and drug education, domestic violence, drinking and driving, victim impact, anger management, and sexual assault.

The program was consistent with drug treatment programs known to DCF and included fifty-four hours of substance abuse education and counseling, twenty-one hours of group therapy, and twelve-step meetings.

The father planned to avoid people and situations that might threaten his sobriety, planned to call someone for support if presented with a threatening situation, planned to attend extra AA/NA meetings, and planned to continue his participation in his weekly relapse prevention group.

At the time of trial, the father was on probation, conditioned on his sobriety and attending AA. The father previously had brief periods of sobriety, when he was using suboxone, from a few months up to one year.

The judge properly considered the requisite factors under G. L. c. 210, § 3(c ), and found factors ii, iii, iv, v, vi, vii, viii, ix, x, xii, xiv, to be applicable. The record supports the judge's findings in this regard.

Immediately before placement with the preadoptive parents, Max was hospitalized for failure to thrive. The social worker testified that the preadoptive parents have shown to be great advocates in terms of service providers. The preadoptive parents have been attentive to the children's medical, behavioral, and mental health needs. The children have formed a bond with the preadoptive parents and their family. Ariston has called his preadoptive parents "Daddy" and "Papa" since about September, 2015.

The judge made no order for visitation with the mother's daughter (the children's half-sister). We note that the mother did not request sibling visitation at trial, and the mother's daughter is not a party to this case.